FILED
05/08/2019
Clerk of the
Appellate Courts

IN THE SUPREME COURT OF TENNESSEE
AT NASHVILLE
October 4, 2018 Session

**COFFEE COUNTY BOARD OF EDUCATION**
v.
**CITY OF TULLAHOMA**

**Appeal by Permission from the Court of Appeals**
**Chancery Court for Coffee County**
**No. 2014-CV-179   Vanessa A. Jackson, Judge**

_____

**No. M2017-00935-SC-R11-CV**

_____

This is one of five cases on appeal to this Court regarding the proper distribution of liquor-by-the-drink tax proceeds between a county and a municipality within the county. In each case, the county had not approved the liquor-by-the-drink sales, but the city had approved such sales. The Commissioner of the Tennessee Department of Revenue, who collects taxes on all liquor-by-the-drink sales, distributed tax proceeds to the defendant cities in accordance with the liquor-by-the-drink tax distribution statute, Tennessee Code Annotated section 57-4-306. The statute required the recipient cities to then distribute half of their proceeds "in the same manner as the county property tax for schools is expended and distributed." Tenn. Code. Ann. § 57-4-306(a)(2)(A) (2013). In each case, the recipient city distributed half of its tax proceeds to its own city school system and did not share the proceeds with the county. The counties sued the cities, claiming that the statute required the cities to distribute the tax proceeds as the counties distribute the county property tax for schools, which is pro rata among all schools in the county based on average daily attendance. In the instant case, the trial court granted summary judgment against the county and in favor of the city. The Court of Appeals reversed, concluding that the tax distribution statute plainly required the city to distribute half of its liquor-by-the-drink tax proceeds pro rata among all schools in the county. The city appeals. We agree with the city and hold that the distribution statute directed cities to expend and distribute half of their liquor-by-the-drink tax proceeds for the benefit of the city's own school system, if any. In this case, because the city has its own school system, it was permitted to use half of its liquor-by-the-drink tax proceeds for its own school system, and it was not required to share those proceeds with the county or the county

schools. Therefore, we reverse the Court of Appeals and affirm the trial court's grant of summary judgment in favor of the city.

**Tenn. R. App. P. 11 Appeal by Permission; Judgment of the
Court of Appeals Reversed; Judgment of the Trial Court Affirmed**

HOLLY KIRBY, J., delivered the opinion of the Court, in which JEFFREY S. BIVINS, C.J., and CORNELIA A. CLARK, SHARON G. LEE, and ROGER A. PAGE, JJ., joined.

Kristin Ellis Berexa and Mark E. McGrady, Nashville, Tennessee, for the Defendant/Appellant, City of Tullahoma.

Eric J. Burch, Manchester, Tennessee, for the Plaintiff/Appellee, Coffee County Board of Education.

**OPINION**[1]

The issues in this case are better understood with some knowledge of the development of the pertinent liquor-by-the-drink statutes. Consequently, we offer some background on the history of the statutes before we outline the facts and analyze the issues.

**The Liquor-By-The-Drink Act**

During the years of federal prohibition (1920–1933), Tennessee had "bone dry" laws, which criminalized the sale, purchase, receipt, possession, transport, and manufacture of alcoholic beverages. *City of Chattanooga v. Tenn. Alcoholic Beverage Comm'n*, 525 S.W.2d 470, 472 (Tenn. 1975); Tenn. Op. Att'y Gen. 79-215 (May 3, 1979). After prohibition ended, Tennessee enacted a "local option" law authorizing counties to hold county-wide local option elections on whether to allow off-premises (package) sales of alcoholic beverages within their borders. *City of Chattanooga*, 525 S.W.2d at 472; *Chadrick v. State*, 137 S.W.2d 284, 285 (Tenn. 1940); *see also Templeton v. Metro. Gov't of Nashville & Davidson Cnty.*, 650 S.W.2d 743, 754 (Tenn. Ct. App. 1983). "The 'bone dry law' continued in effect in counties not electing to come under the

---

[1] This appeal was consolidated with four other cases for oral argument only, as we will discuss in more detail below. *See infra* note 12 and accompanying text.

- 2 -

provisions of the local option law." *City of Chattanooga*, 525 S.W.2d at 472; *see also Renfro v. State*, 144 S.W.2d 793, 794 (Tenn. 1940).

In 1967, the Legislature passed comprehensive legislation related to liquor sales for on-premises consumption, i.e., liquor by the drink (hereinafter "LBD"). We refer to this as "the LBD Act." The LBD Act "authorize[s] the sale of intoxicating liquors by the drink for consumption on the premises, impose[s] taxes upon such sales[,] and provide[s] for the collection thereof." *Aetna Cas. & Sur. Co. v. Woods*, 565 S.W.2d 861, 865 (Tenn. 1978). Initially, the LBD Act allowed only the largest counties to hold local option elections. *See* Tenn. Code Ann. § 57-164 (1968). Gradually, in increments, the Act was amended to allow all counties—as well as all municipalities—to approve LBD sales by local option election. *See* 1987 Tenn. Pub. Acts, ch. 456 § 2; 1992 Tenn. Pub. Acts, ch. 711 § 1.

In any jurisdiction that approves LBD sales, such sales can lawfully be made by the establishments enumerated in the statutes, including restaurants, hotels, and sports facilities. *See* Tenn. Code Ann. § 57-4-101 (2013). Private clubs are among the enumerated establishments, but they are also permitted to sell LBD even in counties or municipalities that have not adopted LBD.[2]

Tennessee Code Annotated section 57-4-301(c) levies a 15% tax on all LBD sales.[3] Tenn. Code Ann. § 57-4-301(c) (2013). We refer to this as "the LBD tax."

---

[2] This has been the case since at least 1972. Tennessee Code Annotated section 57-4-101(a)(2) authorizes private club sales "subject to the further provisions of [Chapter 4] *other than § 57-4-103*" (which makes Chapter 4 applicable to jurisdictions that have voted for LBD sales by referendum). Tenn. Code Ann. § 57-4-101(a)(2) (2013) (emphasis added). The italicized proviso has been interpreted to allow clubs to "legally sell alcoholic beverages by the drink throughout the state, whether or not the area in which such facilities are located are 'wet' or 'dry' for other purposes." Tenn. Op. Att'y Gen. 79-215 (May 3, 1979). The parties in this case do not dispute that private clubs may sell LBD regardless of whether the jurisdiction in which they are located has approved such sales.

[3] That subsection provides:

(c) In addition to the privilege taxes levied in subdivision (b)(1), there is further levied a tax equal to the rate of fifteen percent (15%) of the sales price of all alcoholic beverages sold for consumption on the premises, the tax to be computed on the gross sales of alcoholic beverages for consumption on the premises for the purpose of remitting the tax due the state, and to include each and every retail thereof.

Tenn. Code Ann. § 57-4-301(c) (2013 & 2018).

Retailers collect the LBD tax from consumers and then forward the tax proceeds to the Commissioner of the Tennessee Department of Revenue ("Commissioner"). *See* Tenn. Code Ann. § 57-4-302 (2013 & 2018). The Commissioner then distributes the LBD tax proceeds in accordance with the statute at issue in this case, Tennessee Code Annotated section 57-4-306. We refer to this as "the distribution statute."

This case involves the application of the distribution statute as it existed prior to the enactment of a July 2014 amendment (effectuated after these lawsuits were filed).[4] The relevant versions of the distribution statute required the Commissioner to distribute 50% of all LBD tax proceeds to Tennessee's "general fund to be earmarked for education purposes." Tenn. Code Ann. § 57-4-306(a)(1). The Commissioner was directed to distribute the remaining 50% of the tax proceeds back "to the local political subdivision" that generated the proceeds. *Id.* § 57-4-306(a)(2).

Important to this appeal, the remaining provisions of the distribution statute described what was to be done with the tax proceeds sent back to the originating local political subdivision. The distribution statute said that half of those proceeds would go to the general fund of the county, city, or town in which the taxes were generated. *Id.* § 57-4-306(a)(2)(B). The other half, the distribution statute stated, "shall be expended and distributed in the same manner as the county property tax for schools is expended and distributed." *Id.* § 57-4-306(a)(2)(A). Interpretation of this provision is the issue presented to us in this case.

**Coffee County**

The facts in the instant case are essentially undisputed. The City of Tullahoma ("the City") is located in Coffee County.[5] The City has at all relevant times had its own municipal school system separate from the Coffee County school system.

---

[4] The distribution statute was amended substantially effective July 1, 2014, after the five lawsuits herein were filed. *See* 2014 Tenn. Pub. Acts, ch. 901 § 1 (H.B. 1403). Unless otherwise specified, references to the distribution statute are to the version in the 2013 volume of the Tennessee Code Annotated, which sets forth the statute as it existed at the time these lawsuits were filed and before the July 2014 amendment.

[5] The City of Tullahoma is also partly located in Franklin County, but Franklin County is not a party to this appeal.

- 4 -

In 1987, citizens of the City passed a referendum authorizing LBD sales within City limits. Coffee County has never approved LBD sales in the unincorporated areas of the county.

The Commissioner has at all times distributed LBD tax proceeds generated from sales in the City in accordance with the distribution statute—50% to the State general fund for education and 50% to the City as the "local political subdivision" from which the taxes were generated.[6] *See* Tenn. Code Ann. § 57-4-306(a).

From the 50% of LBD tax proceeds distributed to the City, the City has at all times retained half of the proceeds in its general fund and distributed the other half to its own school system. The City has never distributed any LBD tax proceeds to Coffee County or to any other local school system in the County. This longstanding practice is consistent with Tennessee Attorney General opinions from the early 1980s interpreting the distribution statute. *See* Tenn. Op. Att'y Gen. 83-36 (Jan. 18, 1983); Tenn. Op. Att'y Gen. 82-21 (Jan. 20, 1982); Tenn. Op. Att'y Gen. 81-270 (Apr. 27, 1981); Tenn. Op. Att'y Gen. 80-457 (Sept. 19, 1980).

On May 30, 2014, the Plaintiff/Appellee Coffee County Board of Education (referred to collectively with Coffee County as "the County") filed this lawsuit against the City[7] for damages based on its failure to distribute LBD tax proceeds to the County under the distribution statute over the previous thirty years.[8] The claim focused on the language in the distribution statute requiring the local political subdivision—here, the City—to distribute half of its LBD tax proceeds "in the same manner as the county property tax for schools is expended and distributed." Tenn. Code Ann. § 57-4-306(a)(2)(A). According to the County, this language meant that the City was required to distribute the proceeds in the way the property tax for schools is "expended and distributed" by the County, which is pro rata with the County school system and all local

---

[6] Prior to the City referendum in 1987, the City received LBD tax proceeds from lawful LBD sales in private clubs.

[7] The original complaint also included the City of Manchester as a defendant, but the City of Manchester settled its portion of the lawsuit and is not a party to this appeal. *See Coffee Cnty. Bd. of Educ. v. City of Tullahoma*, No. M2017-00935-COA-R3-CV, 2018 WL 522423, at *1 & n.2 (Tenn. Ct. App. Jan. 23, 2018).

[8] The County sought $387,488 in damages from the City.

- 5 -

education agencies (LEAs)[9] in the County in accordance with an average daily attendance formula. *See* Tenn. Code Ann. § 49-3-315(a) (2013).

The City denied liability and challenged the County's interpretation of the distribution statute. The City maintained that the distribution statute required the City to expend and distribute LBD tax proceeds in the same manner that the county property taxes for schools are expended and distributed *within the City*, that is, for the benefit of the City school system. The City also argued that, because the County has never approved LBD sales, the distribution statute is inapplicable to the County, and the County, therefore, is not entitled to a share of the City's LBD tax proceeds.

The City and the County filed cross-motions for summary judgment. Both parties averred that the facts were undisputed. Each claimed to be entitled to judgment as a matter of law, based on their differing interpretations of the distribution statute.[10] They each filed a statement of undisputed facts, and neither challenged the other's factual averments for purposes of the summary judgment motions.[11]

In April 2017, the trial court entered an order denying the County's motion and granting the City's motion for summary judgment. The trial court concluded that, based on Tennessee Code Annotated section 57-4-103, the distribution statute is "effective only in jurisdictions which have approved [LBD sales] by referendum. Coffee County has not approved [LBD sales] by referendum, thus the distribution provisions . . . are not effective in Coffee County." As alternative reasoning, the trial court found that the language in the distribution statute is ambiguous. Considering the purpose, legislative history, and entire statutory scheme of the LBD Act, the trial court held that the statute did not require the City to share its portion of the LBD tax proceeds with the County or other schools in the County. The County appealed.

---

[9] Local education agencies (LEAs) are "any county school system, city school system, special school district, unified school system, metropolitan school system or any other local public school system or school district created or authorized by the general assembly." Tenn. Code Ann. § 49-1-103(2) (2013).

[10] The County's motion was for partial summary judgment because, if the trial court were to adopt the County's interpretation of the distribution statute, the issue of damages would still need to be addressed.

[11] Because neither party challenged the other's statement of undisputed facts, the trial court relied on the facts in those statements as true for purposes of resolving the motions for summary judgment.

While the County's appeal was pending before the Tennessee Court of Appeals for the Middle Section, on December 27, 2017, the Tennessee Court of Appeals for the Eastern Section contemporaneously issued four opinions in separate cases involving similar facts and the same legal issue. *See Blount Cnty. Bd. of Educ. v. City of Maryville*, No. E2017-00047-COA-R3-CV, 2017 WL 6606855 (Tenn. Ct. App. Dec. 27, 2017) ("*Blount Cnty.*"); *Bradley Cnty. Sch. Sys. ex rel. Bradley Cnty. Bd. of Educ. v. City of Cleveland*, No. E2016-01030-COA-R3-CV, 2017 WL 6598557 (Tenn. Ct. App. Dec. 27, 2017) ("*Bradley Cnty.*"); *Sullivan Cnty. v. City of Bristol*, No. E2016-02109-COA-R3-CV, 2017 WL 6598559 (Tenn. Ct. App. Dec. 27, 2017); *Washington Cnty. Sch. Sys. ex rel. Washington Cnty. Bd. of Educ. v. City of Johnson City*, No. E2016-02583-COA-R9-CV, 2017 WL 6603656 (Tenn. Ct. App. Dec. 27, 2017) ("*Washington Cnty.*").[12]

In all four Eastern Section cases, the intermediate appellate court panel held in favor of the cities.[13] It first determined that the language in the distribution statute was ambiguous regarding whether a city that operates its own school system is required to remit a portion of its LBD tax proceeds to the county. *Blount Cnty.*, 2017 WL 6606855, at *9; *Bradley Cnty.*, 2017 WL 6598557, at *8; *Sullivan Cnty.*, 2017 WL 6598559, at *8; *Washington Cnty.*, 2017 WL 6603656, at *10. After considering the statutory framework, legislative history, and other sources, the Eastern Section panel held that the distribution statute requires the cities to expend and distribute half of their LBD tax proceeds in the manner in which the county property taxes would be expended and distributed within the cities, that is, for the benefit of the cities' own school systems. *See*

---

[12] The decisions were all issued by the same appellate panel, and the legal analysis is substantively identical in each opinion. As in the instant case, the defendant cities in the four parallel cases had their own school systems separate from the plaintiff counties, and the counties had never voted to allow LBD sales. The four cases were consolidated only for purposes of presenting oral argument to the same panel of the Court of Appeals for the Eastern Section on the same day. *See Blount Cnty.*, 2017 WL 6606855, at *3; *Bradley Cnty.*, 2017 WL 6598557, at *3; *Sullivan Cnty.*, 2017 WL 6598559, at *3; *Washington Cnty.*, 2017 WL 6603656, at *3.

[13] Although the legal analysis is substantively identical in each opinion, each case involved different facts, and some involved legal arguments and claims that were not common to all of the cases. *See Blount Cnty.*, 2017 WL 6606855, at *18 (addressing the county's alternative claim for reimbursement of private club LBD tax proceeds); *Bradley Cnty.*, 2017 WL 6598557, *16-17 (addressing the county's argument that the city was not entitled to pre-referendum private club LBD tax proceeds); *Sullivan Cnty.*, 2017 WL 6598559, at *2 (noting, but not addressing, the city's counterclaim for a portion of the county's private club LBD tax proceeds); *Washington Cnty.*, 2017 WL 6603656, at *17 n.9 (noting that the city's constitutional argument was pretermitted by the ruling in favor of the city). Consequently, to resolve all legal claims, the Eastern Section issued a separate opinion in each case.

- 7 -

*Blount Cnty.*, 2017 WL 6606855, at *21; *Bradley Cnty.*, 2017 WL 6598557, at *17; *Sullivan Cnty.*, 2017 WL 6598559, at *17; *Washington Cnty.*, 2017 WL 6603656, at *17.

About a month later, the Court of Appeals in the instant case issued its decision, reaching the opposite result. *Coffee Cnty. Bd. of Educ. v. City of Tullahoma*, No. M2017-00935-COA-R3-CV, 2018 WL 522423, at *4 (Tenn. Ct. App. Jan. 23, 2018) ("*Coffee Cnty.*"). The intermediate appellate court below acknowledged the four decisions issued by the Eastern Section panel but disagreed with the analysis in those decisions. *Id.* at *3-4 (noting that it did "not disagree with [its] learned cohorts lightly"). Rather, the Middle Section panel determined that the applicable language in the distribution statute is unambiguous in favor of the County's interpretation. On its face, the intermediate appellate court held, the statute plainly requires the City to distribute the tax proceeds in the same manner that the County distributes county property taxes for schools, commenting, "[I]t is simply not possible to reasonably read this language to also mean a city that operates its own school system does not have to remit any funds to the county." *Id.* at *4. Having concluded that the language was unambiguous, the court found it unnecessary to consider anything outside the specific statutory provision itself, such as the statutory framework, the legislative history, or the Tennessee Attorney General opinions on the subject. *Id.* at *3. On this basis, it rejected the analysis of the Eastern Section panel in the other four cases.

We granted permission to appeal in this case and also in the four similar cases arising out of the Eastern Section of the Court of Appeals to resolve the split of authority on the proper interpretation of the distribution statute, specifically Section 57-4-306(a)(2)(A), as it existed prior to the July 2014 amendments. Because the five cases all involve this common issue, they were consolidated for oral argument only.[14]

## STANDARD OF REVIEW

We review a trial court's ruling on a motion for summary judgment de novo without a presumption of correctness in the lower court's decision. *Rye v. Women's Care Ctr. of Memphis, MPLLC*, 477 S.W.3d 235, 250 (Tenn. 2015) (citing *Bain v. Wells*, 936 S.W.2d 618, 622 (Tenn. 1997)). Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the

---

[14] This opinion resolves only the dispute between Coffee County and the City of Tullahoma. Separate opinions will be issued in each of the other four cases.

- 8 -

moving party is entitled to a judgment as a matter of law." Tenn. R. Civ. P. 56.04; *Rye*, 477 S.W.3d at 250.

As we have indicated, the relevant facts in the instant appeal are undisputed, and the issues involve only the interpretation of statutes. Issues of statutory interpretation are questions of law, which are also reviewed de novo without a presumption of correctness. *Beard v. Branson*, 528 S.W.3d 487, 494-95 (Tenn. 2017) (quoting *Kiser v. Wolfe*, 353 S.W.3d 741, 745 (Tenn. 2011)); *Circle C Constr., LLC v. Nilsen*, 484 S.W.3d 914, 917 (Tenn. 2016).

## ANALYSIS

The issue on appeal requires us to interpret the distribution statute, specifically, Section 57-4-306(a)(2)(A). This Court has explained:

> "The cardinal rule of statutory construction is to effectuate legislative intent, with all rules of construction being aides [sic] to that end." *Browder*[ *v. Morris*], 975 S.W.2d [308,] 311 [(Tenn. 1998)]; *see Beard*, 528 S.W.3d at 496. We examine "the language of the statute, its subject matter, the object and reach of the statute, the wrong or evil which it seeks to remedy or prevent, and the purpose sought to be accomplished in its enactment." *State v. Collins*, 166 S.W.3d 721, 726 (Tenn. 2005) (citation omitted) (internal quotation marks omitted). "'We must seek a reasonable construction in light of the purposes, objectives, and spirit of the statute based on good sound reasoning.'" *Beard*, 528 S.W.3d at 496 (quoting *Scott v. Ashland Healthcare Ctr., Inc.*, 49 S.W.3d 281, 286 (Tenn. 2001)).

*Spires v. Simpson*, 539 S.W.3d 134, 143 (Tenn. 2017).

"The text of the statute is of primary importance, and the words must be given their natural and ordinary meaning in the context in which they appear and in light of the statute's general purpose." *Mills v. Fulmarque, Inc.*, 360 S.W.3d 362, 368 (Tenn. 2012). Therefore, we look first to the text of the distribution statute. Because the County argues it has been wrongfully denied LBD tax proceeds "dat[ing] at least back to 1980," we consider all versions of the statute relevant to that claim.

The distribution statute is the only statute in the LBD Act that specifies how LBD tax proceeds are to be distributed. The original version, which remained unchanged from 1967 until 1980, read:

- 9 -

57-162. Distributions of collections.—All gross receipt taxes collected under subsection (b) of § 57-157 herein [now Section 57-4-301(c)] shall be distributed by the commissioner of revenue as follows:

> (a) Fifty per cent (50%) to the general fund to be earmarked for education purposes; and
>
> (b) *Fifty per cent (50%) to the local political subdivision.[period]*
>
> (1) *One half (1/2) of the proceeds shall be expended and distributed in the same manner as the county property tax for schools is expended and distributed.*
>
> (2) The other one half (1/2) shall be distributed as follows:
>
>> (a) Collections of gross receipts collected in unincorporated areas, to the county general fund.
>>
>> (b) Collections of gross receipts in incorporated cities, towns, to the city or town wherein said tax is collected.

Tenn. Code Ann. § 57-162 (1968) (emphasis added). The focus of the dispute in this case is the italicized portion of the statute, which mandates that one half of the proceeds distributed to the local political subdivision (25% of the total LBD tax proceeds) "shall be expended and distributed in the same manner as the county property tax for schools is expended and distributed." *Id.* We refer to this provision as "the local education provision."

As we have indicated, until 1971, only counties could sell LBD. Consequently, when the distribution statute was enacted in 1967, it was relevant primarily to counties. However, after the LBD Act was amended to permit municipalities to sell LBD, the distribution language remained unchanged.

In 1980, Title 57 of the Tennessee Code was recodified, and Section 57-162 became Section 57-4-306. In its recodified version, the distribution statute was changed

- 10 -

in only a few nonsubstantive ways. *Id.* § 57-4-306 (1980). The only change in the local education provision was to replace the first "period" with "as follows:" thereby connecting the percentage paid for local education with the distribution instructions.[15]

Soon thereafter, queries were made to Tennessee's Attorney General regarding the proper interpretation and application of the local education provision. In 1980, shortly after the recodification of the LBD Act, a county attorney from Weakley County sought an opinion from the Attorney General on the following question: "What is the proper distribution of the [LBD] gross receipts privilege taxes under T.C.A. § 57-4-306(2) when a municipality but not the county has approved by referendum the sale of [LBD]?" Tenn. Op. Att'y Gen. 80-457 (Sept. 19, 1980). In the opinion, the Attorney General first noted that, pursuant to Tennessee Code Annotated section 57-4-103(a), the LBD Act was effective only in counties or municipalities that had approved LBD sales by referendum.[16] *Id.* Consequently, the Attorney General concluded, "if the county has not elected by local referendum to come within Chapter 4, none of its provisions would apply, including the distribution provisions under T.C.A. § 57-4-306." *Id.* at *2. On that basis, the Attorney General opined that the county was not intended to receive any of the LBD tax proceeds paid to the municipality. The Attorney General interpreted the local education provision as directing the municipality to "expend one half of the amount received in the same manner as the county property tax for schools would be expended *within the city or town*." *Id.* (emphasis added); *see also* Tenn. Op. Att'y Gen. 82-21 (Jan. 20, 1982) (noting that the same rule applies to tax proceeds generated from private club LBD sales when the city operates its own school system and neither the county nor the city has approved LBD sales by referendum).

---

[15] The recodified local education provision read:

> (2) Fifty per cent (50%) to the local political subdivision as follows:
>
> (A) One half (1/2) of the proceeds shall be expended and distributed in the same manner as the county property tax for schools is expended and distributed.

Tenn. Code Ann. § 57-4-306(2)(A) (1980).

[16] At the time, Section 57-4-103(a) provided that "[t]he provisions of [Chapter 4] shall not be effective except in . . . [certain counties and municipalities within certain population parameters] . . . , and when they have been authorized by referendum of the voters of either the county or the municipality in a referendum conducted in the manner provided by § 57-3-106 . . . ." Tenn. Code Ann. § 57-4-103(a) (1980).

- 11 -

Irrespective of the merits of Attorney General Opinion 80-457,[17] it is undisputed that cities receiving LBD tax proceeds relied on it in practice and retained all LBD tax proceeds the Commissioner distributed to them. This was the case even for cities without a separate city school system, where children who were city residents attended county schools.

This situation prompted a second request for an Attorney General opinion, this one from the executive director of the County Services Association, on the following issue: "In those counties where the municipalities do not operate a separate school system, but students residing in the municipalities attend county schools, would the municipalities be required to remit one-half of the liquor-by-the-drink gross receipts privilege taxes to the county school fund under T.C.A. § 57-4-306?" Tenn. Op. Att'y Gen. 81-270 (Apr. 27, 1981). The Attorney General responded by reaffirming Opinion 80-457 but opining that cities without a separate city school system "would naturally have to [remit one-half of its LBD tax proceeds] to the county school fund." *Id.* The Attorney General reasoned that "the purpose of the statute is to earmark a certain percentage of the proceeds of [LBD] taxes for the purpose of local education. This objective could be accomplished by the remittance of such amount to the county school fund . . . ." *Id.*

Soon after Attorney General Opinion 81-270 was issued, Tennessee's Legislature amended the local education provision to align with the interpretation espoused in that opinion. The general distribution instructions for local political subdivisions remained the same, but the Legislature added a specific proviso that any municipality without its own school system would be required to remit half of its LBD tax proceeds "to the county school fund." The amended local education provision read:

(2) Fifty percent (50%) to the local political subdivision as follows:

(A) One half (½) of the proceeds shall be expended and distributed in the same manner as the county property tax for schools is expended and distributed; *provided, however, that*

---

[17] The Eastern Section panel of the Court of Appeals in the other four cases, as well as the Middle Section panel in this case, both rejected the reasoning behind Attorney General Opinion 80-457. However, as explained more fully below, Attorney General Opinion 80-457 is important to our analysis because its ultimate statutory interpretation was the basis for the subsequent 1982 amendment to the local education provision and because its interpretation was followed in the ensuing years by cities and counties alike.

> *except in [Bedford County]*[18] *any proceeds expended and distributed to municipalities which do not operate their own school systems separate from the county are required to remit one half (½) of their proceeds of the gross receipts liquor-by-the-drink tax to the county school fund . . . .*

Tenn. Code Ann. § 57-4-306(a)(2)(A) (2013) (emphasis added). The italicized language, called "the 1982 proviso," was effective from 1982 until the statute was amended in July 2014.

Soon after the 1982 proviso became effective, the Attorney General received a request from a County Attorney from Anderson County for a third opinion, this one asking about the effect of the new proviso: "What is the proper distribution of the [LBD] gross receipt privilege taxes under T.C.A. § 57-4-306(2)(A), in light of the 1982 amendments, when a municipality but not the county has approved by referendum the sale of alcoholic beverages for consumption on the premises?" Tenn. Op. Att'y Gen. 83-36 (Jan. 18, 1983). The Attorney General responded that the 1982 amendment to the distribution statute "was merely a codification of our opinion dated April 27, 1981." *Id.* The Attorney General did not revise either of the previous opinions.

Thus, under these three opinions issued by the Attorney General in 1980–1982, the proper distribution of LBD tax proceeds depends on whether the municipality has its own school system. If the municipality does not have its own school system and the city children attend county schools, half of the tax proceeds must go to the county school fund. But "[i]f the municipality does operate a separate school system, it would be entitled to the fifty percent of the [LBD] gross receipts privilege tax." *Id.*

In the instant case, as well as in the other four parallel cases, the cities distributed LBD tax proceeds in a manner consistent with the 1980–1982 Attorney General opinions for over thirty years—from the time the opinions were issued until the county lawsuits were filed in 2014. During this time period, the Legislature made no amendments to the local education provision, either in response to any of the Attorney General's opinions or to the municipalities' practices in distributing LBD tax proceeds.

---

[18] The language omitted and replaced by the bracketed language in subsection (a)(2)(A) reads: "except in counties having a population of not less than twenty-seven thousand nine hundred (27,900) nor more than twenty-seven thousand nine hundred twenty (27,920), according to the 1980 federal census or any subsequent federal census." It is undisputed that this language was intended to except Bedford County from the provision.

Against this backdrop, we examine the text of the local education provision in the 1980–2013 versions of the distribution statute. The local education provision has always required the Commissioner to distribute 50% of the total LBD tax proceeds directly to the local political subdivision from which the LBD sales were generated.[19] The County does not challenge the Commissioner's distribution to the City in this case.[20] Rather, the County challenges the manner in which the City expended and distributed the half of its tax proceeds meant for local education.

The distribution instructions in the local education provision require that 50% of the proceeds "shall be" expended and distributed in a certain way. Tenn. Code Ann. § 57-4-306(a)(2)(A). It is written in the passive voice, so the entity that is to "expend[] and distribute[]" the proceeds under this subsection is not identified. *Id.* However, because the Commissioner pays this portion of the tax proceeds to the local political subdivision, the parties do not dispute that it is necessarily the local political subdivision receiving the LBD tax proceeds (here, the City) that must do the "expend[ing] and distribut[ing]" under the local education provision. *Id.*

The determinative question in this appeal centers on the next part of the statute, regarding the manner of distribution. It requires the local political subdivision to expend and distribute half of the tax proceeds paid to it "in the same manner as the county property tax for schools is expended and distributed."[21] Tenn. Code. Ann. § 57-162

---

[19] As noted by the Eastern Section Court of Appeals, "the County and each of the Cities are local political subdivisions of the state." *Blount Cnty.*, 2017 WL 6606855, at *7; *see also Bradley Cnty.*, 2017 WL 6598557, at *6; *Sullivan Cnty.*, 2017 WL 6598559, at *6; *Washington Cnty.*, 2017 WL 6603656, at *7.

[20] The Commissioner was not included as a defendant in this case or in any of the four parallel cases.

[21] The language of the local education provision was apparently borrowed from Tennessee Code Annotated section 67-6-712(a), enacted four years earlier as part of the Local Option Revenue Act (LORA). *See* 1963 Tenn. Pub. Acts., ch. 329 § 4. Under LORA, half of the taxes levied by the county under the Act are to be distributed by the county trustee, and "[o]ne-half (½) of the proceeds shall be expended and distributed in the same manner as the county property tax for school purposes is expended and distributed." Tenn. Code Ann. § 67-6-712(a)(1) (2018) (current statute). Although this LORA provision is nearly identical to the first part of the local education provision in the LBD Act, the taxes involved in the statutes are substantially different from each other, and the LORA statute does not have a "1982 proviso" counterpart. Therefore, the interpretation of LORA does not inform our interpretation of the distribution statute in the LBD Act.

- 14 -

(1968); *id.* § 57-4-306(a)(2)(A) (1968 & 2013). Thus, the manner of distribution is also described in the passive voice. The entity whose "manner" of distribution (of the county property tax for schools) must be duplicated is not explicitly identified. The provision's failure to identify this entity as either the municipality or the county gives rise to the dispute in this appeal.

Although the distribution statute does not cite a statute or describe how the county property taxes are distributed, it is undisputed that the manner in which counties currently distribute county property taxes for schools is set forth in Tennessee Code Annotated section 49-3-315.[22] This statute requires the County Trustee, in cooperation with the County Director of Schools, to distribute property tax proceeds pro rata among all LEAs in the county in accordance with average daily attendance (ADA) in each school. Tenn. Code Ann. § 49-3-315. City schools, in turn, receive their pro rata share of the county property tax proceeds from the County Trustee for the benefit of the children who attend those city schools. *Id.* The question becomes, when a municipality with its own school system receives LBD tax proceeds from the Commissioner, how is it required to expend and distribute the education portion of the funds under the local education provision?

As noted above, "[t]he cardinal rule of statutory construction is to effectuate legislative intent." *Spires*, 539 S.W.3d at 143 (quoting *Browder*, 975 S.W.2d at 311). Accordingly, we must determine what the Legislature intended when it directed recipient municipalities to expend and distribute half of their LBD tax proceeds "in the same manner as the county property tax for schools is expended and distributed." Tenn. Code Ann. § 57-4-306(a)(2)(A).

While the courts in all five of the parallel cases recognized that interpretation of this language was the determinative issue, the paths taken to resolve the issue varied widely. Looking first at the trial court decisions, we note that each one resolved the issue in a different way. In the instant case, the trial court found the language in the local education provision to be ambiguous, and it then determined that the purpose, legislative history, and entire statutory scheme of the LBD Act indicated that the City was not required to share LBD tax proceeds with counties. *Coffee Cnty.*, 2018 WL 522423, at *1. The *Blount County* trial court employed a similar analysis, concluding that the statute was

---

[22] Although the "in the manner" language in the LBD Act has remained the same during the span of the pertinent 30-year period, the precise manner in which counties are required to distribute county property taxes for schools has changed from time to time. Given our resolution of this appeal, it is not necessary for us to sort out the details of the county property tax distribution scheme and how it has evolved over the years.

ambiguous and that the legislative history of the 1982 amendment and the contemporaneous Attorney General opinions indicated that cities are not required to share LBD tax proceeds with counties. *See Blount Cnty.*, 2017 WL 6606855, at *3.

The trial court in *Washington County* also found the relevant statutory language to be ambiguous. However, it relied on public policy considerations to construe the statute in favor of the counties. *See Washington Cnty.*, 2017 WL 6603656, at *2-3.

The *Sullivan County* trial court, like the Middle Section panel of the Court of Appeals in the instant case, found the statute to be plain and unambiguous. It found, however, that the language was unambiguous *in favor of the cities*, which is the *opposite* of the conclusion reached by the Middle Section panel. *Sullivan Cnty.*, 2017 WL 6598559, at *2.

The *Bradley County* trial court avoided any finding on ambiguity whatsoever. Instead, it held in favor of the cities by reasoning that counties that had not adopted an LBD referendum had no rights or responsibilities under the distribution statute.[23] *Bradley Cnty.*, 2017 WL 6598557, at *2-3 (citing Tenn. Code Ann. § 57-4-103(a)).

The Eastern and Middle Section panels of the Court of Appeals also reached different conclusions, pivoting off the threshold ambiguity determination. The Eastern Section panel first deemed the statutory language to be ambiguous and then considered at length the statutory framework, the Attorney General opinions, and the legislative history behind the 1982 proviso; it ultimately held in favor of the cities. *See Blount Cnty.*, 2017 WL 6606855, at *8-9; *Bradley Cnty.*, 2017 WL 6598557, at *7-8; *Sullivan Cnty.*, 2017 WL 6598559, at *7-8; *Washington Cnty.*, 2017 WL 6603656, at *9-10. In contrast, the Middle Section panel deemed the statutory language to be unambiguous in favor of the County. Based on this finding, it declined to consider anything outside the bare language of the local education provision. *Coffee Cnty.*, 2018 WL 522423, at *3-4 (noting that reference to statutory framework, legislative history, and the Attorney General opinions was not necessary because the language was unambiguous).

Thus, nearly a dozen experienced judges, both trial and appellate, all encountered the same language in the local education provision and reached the full spectrum of conclusions on the "ambiguity" of that language. This perhaps demonstrates why "some

---

[23] The *Bradley County* trial court specifically rejected the argument that the July 2014 amendment declares the Legislature's original intent to require municipalities to share LBD proceeds with other schools in the county pro rata. *Bradley Cnty.*, 2017 WL 6598557, at *2.

- 16 -

judges and commentators came to criticize the 'ambiguous versus unambiguous' dichotomy used [as] an arbitrary barrier to the use of important tools for interpreting . . . statutes." *Individual Healthcare Specialists, Inc. v. BlueCross BlueShield of Tenn., Inc.*, 566 S.W.3d 671, 686 n.15 (Tenn. 2019) (citing Lawrence M. Solan, *Pernicious Ambiguity in Contracts and Statutes*, 79 Chi.-Kent L. Rev. 859, 859 (2004) ("The problem, perhaps ironically, is that the concept of ambiguity is itself perniciously ambiguous."); Ward Farnsworth et al., *Ambiguity About Ambiguity: An Empirical Inquiry into Legal Interpretation*, 2 J. Legal Analysis 257, 276 (2010) ("If one person says that both proposed readings of [legal text] seem plausible, and a colleague disagrees, finding one reading too strained, what is there to do about it but for each to stamp his foot?")).

Unfortunately, there is no reliable tool for determining whether a statute is ambiguous. Indeed, "there are theories that say what to do *when* a statute is ambiguous, but there are no theories that help determine *whether* a statute is ambiguous . . . . The 'magic wand of ipse dixit' is the standard tool for deciding such matters . . . ." Farnsworth, *supra*, at 275-76 (emphasis in original) (footnotes omitted). As has been observed,

> "[T]here is often no good or predictable way for judges to determine whether statutory text contains 'enough' ambiguity to cross the line beyond which courts may resort to . . . legislative history [or other tools of construction]. . . .
> ….
> . . . One judge's clarity is another judge's ambiguity. It is difficult for judges (or anyone else) to perform that kind of task in a neutral, impartial, and predictable fashion."[24]

Brett M. Kavanaugh, *Fixing Statutory Interpretation*, 129 Harv. L. Rev. 2118, 2136-37 (2016) (reviewing Robert A. Katzmann, *Judging Statutes* (2014)).[25]

---

[24] The author adds:

In my experience, judges will often go back and forth arguing over this point. One judge will say that the statute is clear, and that should be the end of it. The other judge will respond that the text is ambiguous . . . . Neither judge can convince the other. That's because there is no right answer.

Kavanaugh, *supra*, at 2136.

We will endeavor to clarify. The purpose of any finding on ambiguity is simply to anchor the ultimate interpretation of the statute to its text. It is intended as an aid to reasoned statutory interpretation, not an impediment. Any initial perception on whether a statute appears ambiguous should not be used in a mechanistic manner that disregards essential interpretive information.

In determining whether statutory language is ambiguous, courts are not to put on blinders to *all* considerations outside the specific text in question. In all cases involving statutory construction, judges must look not only at "the language of the statute," but also "its subject matter, the object and reach of the statute, the wrong or evil which it seeks to remedy or prevent, and the purpose sought to be accomplished in its enactment." *Spires*, 539 S.W.3d at 143 (quoting *Collins*, 166 S.W.3d at 726) (citation omitted) (internal quotation marks omitted)). Furthermore, statutes should not be interpreted in isolation. The overall statutory framework must be considered, and "[s]tatutes that relate to the same subject matter or have a common purpose must be read *in pari materia* so as to give the intended effect to both." *In re Kaliyah S.*, 455 S.W.3d 533, 552 (Tenn. 2015). Depending on the circumstances of a given case, consideration of the statute's purpose, its evolution over the course of time, and a longstanding interpretation by the affected parties may be needed to properly evaluate whether a proffered alternate interpretation is "a nonsensical or clearly erroneous interpretation of a statute." *Powers v. State*, 343 S.W.3d 36, 50 n.19 (Tenn. 2011) (discussing ambiguity).

In this case, the Middle Section Court of Appeals first deemed the specific language in question unambiguous and then eschewed consideration of anything beyond that specific statutory text. *Coffee Cnty.*, 2018 WL 522423, at *3. Respectfully, for the reasons detailed below, we conclude that this was error.

In making its ruling, the Middle Section panel opined that "it is simply not possible to reasonably read" the statutory language in accordance with the City's interpretation. *See Coffee Cnty.*, 2018 WL 522423, at *4. However, the evolution of the local education provision, the adoption of the 1982 proviso, and the longstanding application of the distribution statute all militate against this conclusion. The distribution

---

[25] The author comments that, "even though ambiguity is unavoidable as a practical matter, perhaps we can avoid attaching serious interpretive consequences to binary ambiguity determinations that are so hard to make in a neutral, impartial way." Kavanaugh, *supra*, at 2144. He suggests that, "without initial determinations of ambiguity, judges would instead decide on the best reading of the statute . . . [and] we would not make statutory interpretation depend so heavily on the difficult assessment of whether the text is clear or ambiguous." *Id*. at 2150.

statute was first applicable only to counties and then later made applicable to cities, without any modification of the original "manner of distribution" language. The fact that cities with a school system expend the county property taxes *they receive* for their own school systems indicates that it is not unreasonable to interpret the local education provision as directing cities to use half of their LBD tax proceeds for their own schools. Moreover, the successive inquiries to the Attorney General regarding how to interpret the recodified 1980 version of the statute tend to show that, at that time, numerous county attorneys were not convinced that the County's interpretation was the only plausible one. The addition of the 1982 proviso indicates legislative intent to differentiate between cities with a school system and those without a school system, consistent with the City's interpretation. Finally, the fact that the City's interpretation aligns with several Attorney General opinions, as well as the fact that the cities and counties alike abided by this interpretation for over thirty years, both indicate that the City's interpretation is neither "nonsensical" nor "clearly erroneous," a finding that is necessary in order to deem the statute unambiguous. *Powers*, 343 S.W.3d at 50 n.19.

In addition, the Middle Section panel criticized the interpretation of the local education provision advocated by the City by noting that it "would require adding words to the statute." *Coffee Cnty*., 2018 WL 522423, at *4. Unfortunately, because the statutory provision is written in the passive voice, the interpretations advocated by *both* parties require "adding words to the statute." *See id*. (stating that section 57-4-306(a)(2)(A) clearly directs the municipality to "expend the 25 percent *like the county* expends the county property tax" (emphasis added)). As we have noted, the distribution statute refers to "the manner" of distribution, but the entity whose "manner" of distribution must be duplicated is not explicitly identified. *See* Tenn. Code. Ann. § 57-162 (1968); *id.* § 57-4-306(a)(2)(A) (1980); *id.* § 57-4-306(a)(2)(A) (2013). Contrary to the conclusion of the Middle Section panel, this omission in the statute leaves it open to the interpretation advanced by the City as well as the one advocated by the County. It falls to this Court, then, to choose between the two.

The Legislature's failure to amend the distribution statute after the Attorney General opinions and the universal practical construction of the statute by counties and cities across Tennessee serves as the basis for application of the doctrine of legislative inaction. Under that doctrine, legislative inaction following a contemporaneous and practical interpretation of a statute is considered persuasive evidence of the Legislature's intent to adopt that interpretation. 2B Sutherland Statutory Construction § 49:9 (7th ed. Nov. 2018 update) (collecting cases). We recently explained that the doctrine of legislative inaction

- 19 -

is not a rule of law; rather, it is a judicial principle that permits—but does not compel—a presumption of legislative acquiescence in a prior judicial interpretation of the statute. *It is more likely that courts will apply the doctrine if the statute in question is subsequently amended in other particulars. See* 73 Am. Jur. 2d Statutes § 82. "[L]egislative action by amendment or appropriation of some parts of a law which has received a contemporaneous and practical construction may indicate approval of interpretations relating to the unchanged and unaffected parts." 2B Sutherland Statutory Construction § 49:9 (7th ed.).

*Hardy v. Tournament Players Club at Southwind, Inc.*, 513 S.W.3d 427, 444 (Tenn. 2017) (emphasis added) (footnote omitted). Thus, this Court has recognized that the doctrine carries more force where, as here, some parts of a statute are amended. Under those circumstances, legislative inaction as to the remaining parts indicates approval of the contemporaneous and practical construction.

Most often, application of the doctrine is based on judicial construction of the statute. *Hamby v. McDaniel*, 559 S.W.2d 774, 776 (Tenn. 1977) (stating that the Legislature's failure to "express[] disapproval of a judicial construction of a statute is persuasive evidence of legislative adoption of the judicial construction"), *abrogation on other grounds recognized by Hardy*, 513 S.W.3d at 444 n.17. However, an Attorney General's opinion, particularly when coupled with reliance, may also support application of the doctrine of legislative inaction. 2B Sutherland, *supra*, at § 49:9 n.1 (citing *Goble v. Mazie Dependent Sch. Dist. D-32*, 488 P.2d 156, 157 (Okla. 1971)).

As we have stated, the Legislature left untouched the general instructions in the local education provision, but it amended the statute "in other particulars" by adding the 1982 proviso. Moreover, we have not one, but three Attorney General opinions on the topic, and there is little doubt that the Legislature was aware of what the Attorney General opined. Indeed, it can be inferred from the wording and the timing of the 1982 proviso that the Legislature enacted the proviso in order to codify Attorney General Opinion 81-270.[26] The Legislature's enactment of the 1982 proviso closely followed the 1981 Attorney General opinion, which itself referenced the 1980 Attorney General opinion. *See* Tenn. Op. Att'y Gen. 81-270 ("It was opined in 10 Op. Att. Gen. 231, No.

---

[26] To the extent that confirmation of this fact is needed, it is provided by the legislative history of the 1982 proviso, quoted at length by the Eastern Section panel in its opinions in the four parallel cases. *See Blount Cnty.*, 2017 WL 6606855, at *13-16; *Bradley Cnty.*, 2017 WL 6598557, at *11-14; *Sullivan Cnty.*, 2017 WL 6598559, at *11-15; *Washington Cnty.*, 2017 WL 6603656, at *12-15.

139 (September 19, 1980) that, if a municipality, but not the county, had approved by referendum the sale of alcoholic beverages for consumption on the premises, the fifty percent distribution of the gross receipts liquor-by-the-drink tax collected under T.C.A. § 57-4-306(2) would go entirely to the local municipality."). In addition, the Attorney General later noted that the 1982 proviso was a codification of the 1981 Attorney General opinion. *See* Tenn. Op. Att'y Gen. 83-36 (Jan. 18, 1983) ("As can be seen[,] the 1982 amendment to the statute was merely a codification of our opinion dated April 27, 1981.").

After the addition of the 1982 proviso, knowing the state of the law and the practical construction that had been placed on the local education provision, the Legislature amended the distribution statute four more times. Each time the general instructions in the local education provision remained untouched.

The Legislature's failure to amend the general-instructions portion of the distribution statute for over thirty years, when it knew that municipalities were distributing LBD tax proceeds in accordance with the interpretation of the statute in the Attorney General's 1980 and 1981 opinions, indicates that the Legislature agreed with, or at least acquiesced in, the Attorney General's interpretation of the statute. It amounts to legislative adoption of this interpretation. *See Thompson v. Memphis City Sch. Bd. of Educ.*, 395 S.W.3d 616, 629 (Tenn. 2012) ("The [L]egislature's failure to 'express disapproval of a judicial construction of a statute is persuasive evidence of legislative adoption of the judicial construction.'" (quoting *Freeman Indus. v. Eastman Chem. Co.*, 172 S.W.3d 512, 519 (Tenn. 2005))); *LaFever v. Ware*, 365 S.W.2d 44, 47 (Tenn. 1963) ("Construction of the constitution adopted by the legislative department and long accepted and acquiesced in by the people is entitled to great weight, and in the absence of some showing of palpable error, is to be accepted as a correct interpretation.").

The County acknowledges the longstanding interpretation and application of the distribution statute. It argues, however, that this longstanding application of the statute has been based on a colossal mistake, a continued misinterpretation and misapplication of the clear meaning of the distribution statute. To support this assertion, the County points to the Legislature's overhaul of the distribution statute in July 2014 as "indicative of how the Legislature originally wanted to interpret the first statute."

We disagree. As we have observed, the City's interpretation of the distribution statute is not unreasonable. Moreover, the actual amendment of the distribution statute does not favor the County's position. Under the July 2014 amendment, the distribution statute was deleted in its entirety and replaced with a new one that contained a much

- 21 -

more detailed local education provision.  *See* 2014 Tenn. Pub. Acts, ch. 901 § 1 (H.B. 1403).  The amendment was not intended to be retroactive; by its terms, the new statute was made effective for one year, and it has been renewed each year since.

In our view, the 2014 amendment and its subsequent renewals do not support the County's interpretation of the distribution statute; they reflect only that the distribution statute was in sore need of an update.  The amendment does not clearly favor either the City's or the County's interpretation of the pre-July 2014 statute.[27]  The Legislature could have made the 2014 amendment retroactive, but it chose not to.[28]  Most important, the 2014 amendment simply does not shed light on the intent of the Legislature *prior to* 2014, and that is our charge in this case.

For all of these reasons, we conclude that the local education provision in the pre-July 2014 versions of the distribution statute required a municipality with its own school system to expend and distribute half of its LBD tax proceeds in the same manner that the county property tax for schools is expended and distributed within the municipality, which is for the benefit of the municipality's own school system.  In the instant case, because the City has its own school system, it was not required to share its LBD tax proceeds with the County during the relevant time period.

In light of this conclusion, we reverse the decision of the Court of Appeals below and affirm the trial court's grant of summary judgment in favor of the City.  All other issues raised on appeal and not specifically addressed are pretermitted by our decision.[29]

---

[27] The 2014 amendment sets forth seven different scenarios for the distribution of the LBD education proceeds based on many factors, such as whether a city operates a city school system, whether a city's school system serves kindergarten through grade twelve, and whether a city is located in more than one county.  *See* Tenn. Code. Ann. § 57-4-306(b)(1)(A) (2018) (current version of amendment).  Notably, it specifically permits cities with a K–12 city school system to keep the education portion of LBD tax proceeds for their own school system, just as the City argues in this case.  *Id.* § 57-4-306(b)(1)(A)(ii) (2018).  The new statute provides a procedure for redress when a "local political subdivision fails to remit the proceeds to the appropriate school fund," but that provision does not inform our inquiry into the proper interpretation of the pre-July 2014 versions of the distribution statute.  *Id.* § 57-4-306(f)-(h) (2018) (current version of amendment).

[28] We need not describe the 2014 amendment in great detail because it does not apply to the County's claim for relief in this case.

[29] The City and County each argue forcefully that their interpretation of the local education provision produces the more fair result.  While we are mindful of the overall purpose of the distribution statute, we agree with the Eastern Section panel of the Court of Appeals that any "argument concerning

## CONCLUSION

The decision of the Court of Appeals is reversed and the decision of the trial court is affirmed. Costs on appeal are to be taxed to the Appellee Coffee County Board of Education, for which execution may issue, if necessary.

_____
HOLLY KIRBY, JUSTICE

---

perceived fairness of the tax distribution scheme provided by the statute would properly be directed to the General Assembly rather than to this Court." *Blount Cnty.*, 2017 WL 6606855, at *18; *Bradley Cnty.*, 2017 WL 6598557, at *16; *Sullivan Cnty.*, 2017 WL 6598559, at *17; *Washington Cnty.*, 2017 WL 6603656, at *17.