FILED
08/16/2022
Clerk of the
Appellate Courts

IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
June 28, 2022 Session

**IN RE HOUSTON D.**

**Appeal from the Juvenile Court for Tipton County**
**No. 19-JV-37        William A. Peeler, Judge**
_____

**No. W2021-00979-COA-R3-JV**
_____

This appeal involves a petition for grandparent visitation filed by the paternal grandparents. The juvenile court granted the petition and the parents appeal. We reverse and dismiss the case.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Reversed**

CARMA DENNIS MCGEE, J., delivered the opinion of the court, in which FRANK G. CLEMENT, JR., P.J., M.S., and J. STEVEN STAFFORD, P.J., W.S., joined.

Rachel K. Witherington, Covington, Tennessee, for the appellants, Randall H. D. and Megan B. D.

Julie C. Bartholomew, Somerville, Tennessee, for the appellees, Randall D. and Holly D.

**OPINION**

### I.        FACTS & PROCEDURAL HISTORY

This is a dispute between a child's parents and paternal grandparents regarding grandparent visitation. The child's parents are Randall H. D. and Megan B. D. ("Father" and "Mother" or, collectively, "Parents"). The child's paternal grandparents are Randall D. and Holly D. ("Grandfather" and "Grandmother" or, collectively, "Grandparents").

In July 2014, Houston D. was born to Parents, who were unmarried at the time. From shortly after his birth until about August 2018, Grandparents provided care for the child approximately two times per week. The child would stay with them all day on Tuesdays and a half-day on Fridays. When the child was about ten months old, he began

staying overnight with Grandparents on occasion. However, Parents ceased these particular visits in August 2018 after an argument about Father's brother ("the paternal uncle"). The paternal uncle, who was approximately 18 years old at the time and still residing with Grandparents, had informed the family that he was gay. The paternal uncle had met a paramour online who was from another state. Afterward, there was a "big ordeal" when the paramour visited the paternal uncle in Grandparents' home, although it was not in the presence of the child. This led to the parties having a conversation about the situation. Parents apparently did not want the child to be around the paramour, and therefore the child was not allowed to be at Grandparents' home when the paramour was present. Grandmother later testified that at one point she asked Parents if the child could stay downstairs in their home while the paternal uncle and his paramour remained upstairs, but Father did not agree to this.

Grandmother admittedly understood why Parents had concerns because the paramour was a stranger that the paternal uncle had met online. Thus, Grandparents agreed to follow Parents' wishes in order to continue their relationship with the child, but Parents still did not allow the child to resume his visits at Grandparents' home. On August 20, 2018, Parents sent a text message to Grandparents stating that the child would no longer be going to Grandparents' home. Around this time, the paternal uncle moved out of Grandparents' home in the hope that Parents would allow the child to continue to have a relationship with Grandparents. Several days later, Grandparents were able to exercise visitation when they took the child to soccer practice. Nevertheless, according to Grandmother, the paternal uncle's move caused a big disruption in the family and the parties' relationship worsened. According to Parents, Grandmother blamed Father for causing the paternal uncle to move out. Mother testified that this was ultimately the reason why she and Father decided that the child was not going to visit Grandparents' home on Tuesdays and Fridays anymore. Moreover, she stated that Grandparents did not attend Parents' wedding in December 2018.

In November 2018, Father had a verbal altercation with his brothers regarding their presence at his upcoming wedding. This resulted in Father breaking a window at Grandparents' home. Afterward, a glass company sent Parents a bill for the broken window, which caused further problems between the brothers. On December 5, 2018, Grandfather sent a text message to Parents asking when he and Grandmother could visit with the child. However, Parents responded with several comments: "he will be just fine without y'all"; "he's got enough grownups in his life"; "he won't be coming around at all"; and "he'll do better without you in his life." Despite the parties' differences, Grandparents were able to spend time with the child on December 23, 2018, to celebrate Christmas. Grandparents also saw the child in January 2019, when he stayed overnight with them at their home. Grandfather then sent a text message to Parents asking to keep the child during the following week, but Parents responded by stating that "with all that has happened, probably not. This is working for us."

In February 2019, Grandparents filed a petition for grandparent visitation. Parents filed an answer to the petition in May 2019. Around this time, Grandmother sent a text message to Father asking if she and Grandfather could see the child on the weekend, to which Father replied, "Write me a check for 3k to pay my lawyer." The parties attempted mediation in May 2019, but they failed to reach an agreement. Despite failing to reach an agreement, Grandparents were still allowed to visit with the child some during the summer of 2019. They saw a movie with the child and attended his birthday party. Beginning in September 2019, they were also allowed to attend the child's weekly karate classes and sometimes spend time with him afterward. In December 2019, however, Parents began to limit Grandparents' time with the child after karate classes. They then ended these visits entirely in July 2020 after Grandparents took the child to their home when Parents asked them not to do so.

The case ultimately proceeded to trial in September 2020. Grandmother, Grandfather, and Mother testified at trial; however, Father elected not to testify.[1] In July 2021, the juvenile court entered an order finding that Parents opposed grandparent visitation. Additionally, the court found that the child had such a significant existing relationship with Grandparents that severance or severe reduction of their relationship was likely to occasion severe emotional harm to the child and posed a danger of substantial harm to the child. After considering the factors set forth in Tennessee Code Annotated section 36-6-307, the court found that it was in the best interests of the child to have visitation with Grandparents. The court concluded that "it must balance the rights of the grandparents to visit their grandson, as detailed in Tennessee Code Annotated [section] 36-6-306, with the rights of the parents' constitutional right to parent their child, pursuant to Article I, Section 8 of the Tennessee Constitution." Therefore, the court awarded visitation to Grandparents, which allotted time for visitation during weekends, holidays, birthdays, and summertime. The court also ordered that notice should be provided to Grandparents of the child's extracurricular and school activities and that Grandparents could exercise additional visitation if the parties mutually agreed to it and reduced it to writing. Thereafter, Parents timely filed their appeal.[2]

---

[1] Upon conclusion of Grandparents' proof, counsel for Parents made a motion for a "directed verdict" and argued that Grandparents had failed to carry their burden of proof concerning specific emotional harm to the child. However, the juvenile court denied the motion. Although the record reflects that counsel for Parents moved for a "directed verdict," we note that the motion should have been characterized as a motion for dismissal pursuant to Tennessee Rule of Civil Procedure 41.02.

[2] After their appeal was filed, Parents filed a motion for stay pending appeal. They argued that it would be in the child's best interests to stay the enforcement of the order granting specific visitation with the child because the child had not seen Grandparents in over a year. Grandparents filed a response and memorandum of law opposing the motion. They stated that they had attempted to contact and exercise visitation pursuant to the court's order, but their efforts were either disregarded or rebuffed by Parents. They noted that Father had responded to one of their requests by stating, "Don't ever show up over here like that again. You ain't welcome over here. You don't have rights to s**t . . . . I'm the daddy of Houston and that's how it's going to be. Don't ever come over here again[.]" They also filed affidavits to support their response. After a hearing on the matter, the juvenile court denied Parents' motion.

## II.   ISSUES PRESENTED

Parents present the following issues for review on appeal, which we have slightly restated:

1. Whether the juvenile court correctly applied the legal standard as required by Tennessee Code Annotated section 36-6-306(a) to find that Parents opposed visitation between Grandparents and the child, or severely reduced visits between Grandparents and the child; and
2. Whether the juvenile court correctly applied the legal standard as required by Tennessee Code Annotated section 36-6-306(b)(1) to find that cessation or severe reduction of the relationship between Grandparents and the child would cause substantial harm or severe emotional harm to the child.

For the following reasons, we reverse the decision of the juvenile court and dismiss the case.

## III.   STANDARD OF REVIEW

On appeal, "[w]e review the trial court's findings of fact de novo upon the record with a presumption of correctness unless the preponderance of the evidence is otherwise." *Coleman v. Olson*, 551 S.W.3d 686, 694 (Tenn. 2018) (citing Tenn. R. App. P. 13(d)). Furthermore, "[w]e defer to the trial court's determination of witness credibility because the trial judge could observe the witnesses' demeanor and hear in-court testimony." *Id.* (citing *King v. Anderson Cnty.*, 419 S.W.3d 232, 245-46 (Tenn. 2013)).

## IV.   DISCUSSION

### A.  Jurisdiction

This appeal involves the application of Tennessee Code Annotated section 36-6-306, i.e., the Grandparent Visitation Statute. As a threshold issue, we address *sua sponte* whether the juvenile court properly exercised subject matter jurisdiction to consider the petition for grandparent visitation in this case. *See Clark v. Johnson*, No. E2017-01286-COA-R3-CV, 2018 WL 2411203, at *5 (Tenn. Ct. App. May 29, 2018) (addressing *sua sponte* whether the chancery court properly exercised subject matter jurisdiction to consider the grandparents' petition upon transfer from the juvenile court when the petition alleged dependency and neglect and no resolution of such an allegation had been adjudicated in the juvenile court). "Appellate courts must consider subject matter jurisdiction even if parties fail to raise or preserve the issue." *Lovlace v. Copley*, 418 S.W.3d 1, 17 (Tenn. 2013); *see* Tenn. R. App. P. 13(b).

Although it was not presented as an issue by either party on appeal, jurisdiction was a question briefly raised by the juvenile court judge at the beginning of trial. Counsel for Grandparents and the judge discussed the issue at length. The judge stated, "the Juvenile Court normally is not involved in this. And it's sort of a unique issue here where we had a child born out of wedlock, then the [parents] got married. And what that does, that sort of wipes all that away. The child is legitimated by virtue of the marriage, and that's . . . a twist . . . ." Counsel for Grandparents responded, "we specifically filed this in Juvenile Court . . . because we thought that the statute was directing us to do that because it doesn't talk about a child born out of wedlock that has not been legitimated." The judge then stated, "Okay. Well, I think chancery or circuit could have heard it, but it's here. And . . . the reason I was raising the issue is because I didn't want all of us to spend the afternoon arguing about this, and then if there's an appeal," the Court of Appeals may determine that the juvenile court did not have jurisdiction. The judge concluded that "[i]t's muddy enough" and determined that it should go ahead and proceed with the trial.

On appeal, this Court raised the question again at oral argument. We requested additional briefing on the issue, and both parties have since submitted their briefs. Under the circumstances of the case, the precise question is whether the juvenile court properly exercised subject matter jurisdiction, pursuant to the Grandparent Visitation Statute, to consider the petition for grandparent visitation when the child was born out of wedlock and the child's parents subsequently married.

### i. Subject Matter Jurisdiction

It is well-established that "[s]ubject matter jurisdiction relates to a court's authority to adjudicate a particular type of case or controversy brought before it." *In re Estate of Trigg*, 368 S.W.3d 483, 489 (Tenn. 2012) (citing *Osborn v. Marr*, 127 S.W.3d 737, 739 (Tenn. 2004); *Northland Ins. Co. v. State*, 33 S.W.3d 727, 729 (Tenn. 2000)); *see Standard Sur. & Cas. Co. of New York v. Sloan*, 173 S.W.2d 436, 440 (Tenn. 1943) ("Jurisdiction is tersely defined . . . as, 'the power to hear and determine a cause.' Or 'the right to adjudicate concerning the subject-matter in the given case.'") (citation omitted). "Subject matter jurisdiction depends on the nature of the cause of action and the relief sought, *see Landers v. Jones*, 872 S.W.2d 674, 675 (Tenn. 1994), and can only be conferred on a court by the constitution or legislative act." *Chapman v. DaVita, Inc.*, 380 S.W.3d 710, 712 (Tenn. 2012); *see Kane v. Kane*, 547 S.W.2d 559, 560 (Tenn. 1977). Without jurisdiction, the orders and judgments entered by courts over the subject matter of a dispute are void. *In re Estate of Trigg*, 368 S.W.3d at 489 (citing *Brown v. Brown*, 281 S.W.2d 492, 497 (Tenn. 1955)). As such, an issue concerning a court's subject matter jurisdiction is considered a threshold inquiry and should be resolved at the earliest possible opportunity. *Id.* (citing *Redwing v. Catholic Bishop for the Diocese of Memphis*, 363 S.W.3d 436, 445 (Tenn. 2012)). "A determination of subject matter jurisdiction involves questions of law; therefore, rulings on such questions are reviewed de novo on appeal, without any presumption of correctness." *Johnson v. Hopkins*, 432 S.W.3d 840, 844 (Tenn. 2013)

(citing *In re Estate of Trigg*, 368 S.W.3d at 489); *see also Lovlace*, 418 S.W.3d at 17; *Chapman*, 380 S.W.3d at 712-13.

Here, the question of whether subject matter jurisdiction exists in the juvenile court depends upon statutory construction. "Unlike circuit or chancery courts, which are courts of general jurisdiction, juvenile courts in Tennessee are courts of limited jurisdiction." *In re D.Y.H.*, 226 S.W.3d 327, 330 (Tenn. 2007) (footnote omitted) (citing *Stambaugh v. Price*, 532 S.W.2d 929, 932 (Tenn. 1976)). Given that the juvenile courts did not exist at common law and are not included in Tennessee's Constitution, "[t]hey are entirely creatures of statute." *State ex rel. Whitley v. Lewis*, 244 S.W.3d 824, 830 (Tenn. Ct. App. 2007); *see* Tenn. Code Ann. § 37-1-101, *et seq*. Therefore, "[j]uvenile courts may exercise only such jurisdiction and powers as have been conferred on them by statute." *In re D.Y.H.*, 226 S.W.3d at 330 (citing *In re S.L.M.*, 207 S.W.2d 288, 296 (Tenn. Ct. App. 2006) (citation omitted)). Like the determination of subject matter jurisdiction, "[s]tatutory construction is also a question of law to which de novo review applies on appeal." *Hopkins*, 432 S.W.3d at 844 (citing *Mills v. Fulmarque, Inc.*, 360 S.W.3d 362, 366 (Tenn. 2012); *Lind v. Beaman Dodge, Inc.*, 356 S.W.3d 889, 895 (Tenn. 2011)).

### ii.      *Statutory Construction*

We now set forth the rules of statutory construction. Foremost, "[t]he cardinal rule of statutory construction is to effectuate legislative intent, with all rules of construction being aides [sic] to that end." *Spires v. Simpson*, 539 S.W.3d 134, 143 (Tenn. 2017) (quoting *Browder v. Morris*, 975 S.W.2d 308, 311 (Tenn. 1998)); *see Beard v. Branson*, 528 S.W.3d 487, 496 (Tenn. 2017). The rules for statutory construction have been summarized by our Supreme Court as follows:

> When interpreting a statute, courts must ascertain and give effect to the legislative intent without restricting or expanding the statute's intended meaning. Our task is to examine the text of the statute and, if the language used is unambiguous, we simply apply the plain meaning of the words used in the statute. As we recently observed, courts must (1) give these words their natural and ordinary meaning, (2) consider them in the context of the entire statute, and (3) presume that the General Assembly intended to give each of these words its full effect. Every word in a statute is presumed to have meaning and purpose. If, after examining the text of the statute, it becomes clear the statute is ambiguous, we may reference the broader statutory scheme, the history of the legislation, or other sources to discern its meaning. However, these non-codified external sources cannot provide a basis for departing from clear codified statutory provisions.

*Lovlace*, 418 S.W.3d at 18 (quoting *Garrison v. Bickford*, 377 S.W.3d 659, 663 (Tenn. 2012) (citations and internal quotation marks omitted)).

- 6 -

However, our Supreme Court has noted that "there is no reliable tool for determining whether a statute is ambiguous." *Coffee Cnty. Bd. of Educ. v. City of Tullahoma*, 574 S.W.3d 832, 845 (Tenn. 2019); *see Bryant v. HCA Health Servs. of N. Tenn., Inc.*, 15 S.W.3d 804, 809 (Tenn. 2000) ("A statute is ambiguous if the statute is capable of conveying more than one meaning."). "[T]here are theories that say what to do *when* a statute is ambiguous, but there are no theories that help determine *whether* a statute is ambiguous . . . . The 'magic wand of ipse dixit' is the standard tool for deciding such matters . . . ." *Id.* (quoting Ward Fansworth et al., *Ambiguity About Ambiguity: An Empirical Inquiry into Legal Interpretation*, 2 J. Legal Analysis 257, 275-76 (2010). On this subject, it has been observed that "there is often no good or predictable way for judges to determine whether statutory text contains 'enough' ambiguity to cross the line beyond which courts may resort to . . . legislative history [or other tools of construction] . . . ." *Id.* (quoting Brett M. Kavanaugh, *Fixing Statutory Interpretation*, 129 Harv. L. Rev. 2118, 2136-37 (2016) (reviewing Robert A. Katzmann, *Judging Statutes* (2014))) (footnote omitted). Our Supreme Court has expounded on the topic of ambiguity by stating the following:

> In determining whether statutory language is ambiguous, courts are not to put on blinders to *all* considerations outside the specific text in question. In all cases involving statutory construction, judges must look not only at "the language of the statute," but also "its subject matter, the object and reach of the statute, the wrong or evil which it seeks to remedy or prevent, and the purpose sought to be accomplished in its enactment." *Spires*, 539 S.W.3d at 143 (quoting [*State v.*] *Collins*, 166 S.W.3d [721,] 726 [(Tenn. 2005)]) (citation omitted) (internal quotation marks omitted). Furthermore, statutes should not be interpreted in isolation. The overall statutory framework must be considered, and "[s]tatutes that relate to the same subject matter or have a common purpose must be read *in pari materia* so as to give the intended effect to both." *In re Kaliyah S.*, 455 S.W.3d 533, 552 (Tenn. 2015). Depending on the circumstances of a given case, consideration of the statute's purpose, its evolution over the course of time, and a longstanding interpretation by the affected parties may be needed to properly evaluate whether a proffered alternate interpretation is "a nonsensical or clearly erroneous interpretation of a statute." *Powers v. State*, 343 S.W.3d 36, 50 n.20 (Tenn. 2011) (discussing ambiguity).

*Id.* at 845-46. As such, "[a]ny initial perception on whether a statute appears ambiguous should not be used in a mechanistic manner that disregards interpretive information." *Id.* at 845.

### iii.    *Statutory Authority*

As previously stated, a juvenile court "may exercise only such jurisdiction and powers as have been conferred on [it] by statute." *In re D.Y.H.*, 226 S.W.3d at 330 (citing *In re S.L.M.*, 207 S.W.2d at 296 (citation omitted)). The Legislature has provided the juvenile court with exclusive original jurisdiction over certain matters, which are enumerated in Tennessee Code Annotated section 37-1-103. Furthermore, the Legislature has provided the juvenile court with concurrent jurisdiction over certain matters, which are enumerated in Tennessee Code Annotated section 37-1-104. Particularly, section 37-1-104 provides:

> (f) Notwithstanding any law to the contrary, the juvenile court has concurrent jurisdiction with the circuit and chancery court of proceedings *to establish the paternity of children born out of lawful wedlock and to determine any custody, visitation, support, education or other issues regarding the care and control of children born out of wedlock*. The court further has the power to enforce its orders. Nothing in this subsection (f) shall be construed as vesting the circuit and chancery court with jurisdiction over matters that are in the exclusive jurisdiction of the juvenile court under § 37-1-103.

Tenn. Code Ann. § 37-1-104(f) (emphasis added). Aside from these provisions, the Legislature has specifically provided the juvenile court with jurisdiction in Tennessee Code Annotated section 36-6-306 to consider petitions for grandparent visitation. The current version of the statute provides in pertinent part as follows:

> (a) Any of the following circumstances, when presented in a petition for grandparent visitation to the circuit, chancery, general sessions courts with domestic relations jurisdiction, other courts with domestic relations jurisdiction or *juvenile court in matters involving children born out of wedlock* of the county in which the petitioned child currently resides, necessitates a hearing if such grandparent visitation is opposed by the custodial parent or parents . . . or if the grandparent visitation has been severely reduced by the custodial parent or parents . . . [.]

Tenn. Code Ann. § 36-6-306(a) (emphasis added). This limitation set out in section 36-6-306(a) governs the jurisdiction of the juvenile court to consider petitions for grandparent visitation. *See Smallwood v. Mann*, 205 S.W.3d 358, 364 (Tenn. 2006) (holding that the juvenile court lacked jurisdiction under a previous version of the statute). Therefore, in order for a juvenile court to properly exercise jurisdiction to consider a petition for grandparent visitation, the child(ren) involved in the matter must be "born out of wedlock." Tenn. Code Ann. § 36-6-306(a).

### iv. Application

Grandparents contend that the language "children born out of wedlock" is plain and

unambiguous.  Parents argue that both the chancery court and the juvenile court would have concurrent jurisdiction under the circumstances.  Parents contend that one could reasonably analyze this statute and determine that the juvenile court was the proper forum and had subject matter jurisdiction because the fact is the child was born out of wedlock.  Yet, they equally contend that one could reasonably analyze this statute and come to the different conclusion that the chancery court was the proper forum because the parents subsequently married.  Given that Parents' argument proposes two different interpretations, it suggests that the statute is ambiguous.

The supplemental briefs filed by both parties also discuss the Grandparent Visitation Statute's prior amendment relative to jurisdiction and the Tennessee Supreme Court's holding from *Smallwood*.  In *Smallwood*, our Supreme Court was faced with a prior version of the Grandparent Visitation Statute, which provided that a petition for grandparent visitation could be heard in "circuit or chancery court."  *Smallwood*, 205 S.W.3d at 364.  In a footnote, the Court expressed concern over the fact that the statute did not give the juvenile court jurisdiction to consider a petition for grandparent visitation, particularly when "[j]uvenile courts are generally deemed not only the court with jurisdiction over all matters involving children whose parents are not married, but also the court most suited to preside over such issues."  *Id.* at 365 n.8.  The Court noted that "considerations of judicial economy and the avoidance of the duplication of proceedings appear compromised by the removal of grandparent visitation petitions from juvenile court when concurrent jurisdiction of other matters relating to the child's custody and visitation remains there under section 37-1-104(f)."  *Id.*; *see* Tenn. Code Ann. § 37-1-104(f) (2005) (giving juvenile court concurrent jurisdiction over paternity, custody, visitation, support, education, and "other issues regarding the care and control of children born out of wedlock").  The Court further noted that it was "not at liberty to ignore the plain meaning of a statute; however, if the Legislature did not intend to remove jurisdiction for grandparent visitation from juvenile courts in these cases, it may want to revisit this issue."  *Id.*; *see, e.g., In re C.K.G.*, 173 S.W.3d 714, 730 n.9 (Tenn. 2005) ("[C]oncerning a variety of issues, this Court has invited legislative action or has reserved lawmaking as more appropriate for the legislature.").  Perhaps in response to this comment in *Smallwood*, the Legislature amended the Grandparent Visitation Statute effective July 1, 2007, to substitute "circuit or chancery court" with the following language: "circuit, chancery, general sessions courts with domestic relations jurisdiction or *juvenile court in matters involving children born out of wedlock*."  *See* 2007 Pub. Acts., ch. 22 § 1 (emphasis added).  It is clear from this amendment that the Legislature intended for the juvenile court to have jurisdiction over petitions for grandparent visitation involving children born out of wedlock.  In this case, what appears to be disputed is whether that jurisdiction remains when a child is born out of wedlock and the child's parents subsequently marry.[3]

---

[3] Following the 2007 amendment to the Grandparent Visitation Statute, this Court decided a case involving a petition for grandparent visitation filed in juvenile court in 2013, where the subject child was born out of wedlock in 2004 and legitimated in 2008.  *In re Camryne B.*, No. M2014-00801-COA-R3-JV,

After examining the text of the Grandparent Visitation Statute, we conclude that it is unambiguous. "[T]his Court must presume that the legislature says in a statute what it means and means in a statute what it says." *Kyle v. Williams*, 98 S.W.3d 661, 664 (Tenn. 2003) (citing *Gleaves v. Checker Cab Transit Corp.*, 15 S.W.3d 799, 803 (Tenn. 2000)). Adhering to that presumption, the Legislature, by using the language "children born out of wedlock," and nothing more or less, was clear. The Grandparent Visitation Statute does not indicate that a subsequent marriage alters the child's circumstance at his birth for purposes of jurisdiction in the juvenile court. *See* Tenn. Code Ann. § 36-6-306(a). The Grandparent Visitation Statue does not reference the marital status of a child's parents other than at the time the child was born. *See id.* We have referred to a child who is not born out of wedlock as one who is born "inside the bounds of marriage."[4] *McVay v. Blen*, No. 02A01-9508-JV-00183, 1996 WL 729911, at *3 (Tenn. Ct. App. Dec. 19, 1996) (citations omitted). Here, this child was not born inside the bounds of marriage because Parents were not married when he was born, and therefore the child was "born out of wedlock."[5] Thus,

---

2014 WL 7181345, at *1 (Tenn. Ct. App. Dec. 16, 2014). Unlike the case at bar, the child's parents in *In re Camryne B.* never married; rather, the child was later legitimated after father filed a petition for legitimation. *Id.* Regardless, this Court did not address the issue of whether the juvenile court retained subject matter jurisdiction when the child was born out of wedlock but later legitimated, and we proceeded to decide the case on the merits. *Id.* at *4-6. Though we did not address the issue of the juvenile court's jurisdiction in *In re Camryne B.*, we think that the case is at least noteworthy for that very reason. We keep in mind, however, that "we should not assume that subject matter jurisdiction existed based on the fact that the issue was not addressed." *Memphis Bonding Co., Inc. v. Crim. Ct. of Tenn. 30th Dist.*, 490 S.W.3d 458, 467 (Tenn. Ct. App. 2015).

[4] We have also referred to a child not born out of wedlock as a "marital child" and a child born out of wedlock as a "non-marital child." *See In re Paisley H.*, No. E2020-00174-COA-R3-JV, 2020 WL 5496679, at *3 (Tenn. Ct. App. Sept. 10, 2020) (explaining that the Grandparent Visitation Statute provides that a petition for grandparent visitation may be filed in the juvenile court in matters involving "non-marital children"); *In re Lachlan B.*, No. E2019-01698-COA-R3-CV, 2020 WL 3542176, at *1 (Tenn. Ct. App. June 30, 2020) (addressing a trial court's decision to change the "non-marital children's" surname); *In re Donovyn B.H.*, No. W2013-02268-COA-R3-JV, 2014 WL 2069339, at *2-3 (Tenn. Ct. App. May 16, 2014) (discussing the differences in the juvenile court's jurisdiction when marital children versus non-marital children are involved).

[5] Although chapter 6 of Title 36 does not define "children born out wedlock," we note that Tennessee Code Annotated section 36-2-302, which concerns parentage and legitimation, defines "[c]hild born out of wedlock" as "a child born to parents *who are not married to each other when the child was born*[.]" Tenn. Code Ann. § 36-2-302(1) (emphasis added). However, the definition's usage is limited to chapter 2 of Title 36 by the language "[a]s used in this chapter . . . ." Tenn. Code Ann. § 36-2-302. Additionally, Tennessee Code Annotated section 31-2-105 defines "a person born out of wedlock" for the purposes of intestate succession, but there is no correlation between this statute and the Grandparent Visitation Statute.

We have construed the intent of the legislature in its use of the phrase "child not born in lawful wedlock" in the past, but it was in the context of legitimation and whether that phrase applied to just a child born to an unmarried woman or to both a child born to an unmarried woman and a child born to a woman who was married to someone other than the child's biological father. *See State ex rel. Cihlar v. Crawford*, 39 S.W.3d 172, 183 (Tenn. Ct. App. 2000); *Cunningham v. Golden*, 652 S.W.2d 910, 912-13 (Tenn. Ct. App. 1983) (superseded by statute).

this was a matter where the petition for grandparent visitation could be filed in juvenile court. *See* Tenn. Code Ann. § 36-6-306(a). Concluding otherwise would be "a forced interpretation that would extend[, or restrict,] the meaning of the language . . . ." *State v. Welch*, 595 S.W.3d 615, 621-22 (Tenn. 2020) (quoting *Carter v. Bell*, 279 S.W.3d 560, 564 (Tenn. 2009)). Here, we would frustrate legislative intent and restrict the meaning of the language by holding that the juvenile court lacked jurisdiction to consider the subject petition when the child was born out of wedlock and then Parents subsequently married.

Because we find that the statute is clear, "we apply the plain meaning without complicating the task." *State v. McNack*, 356 S.W.3d 906, 909 (Tenn. 2011) (citing *Eastman Chem. Co. v. Johnson*, 151 S.W.3d 503, 507 (Tenn. 2004)). Accordingly, we conclude that the juvenile court properly exercised its jurisdiction to consider the petition for grandparent visitation in this case because it was a matter involving a child born out of wedlock.

## *B. Grandparent Visitation*

We now review whether the juvenile court correctly applied the legal standards as required by Tennessee Code Annotated section 36-6-306. At the outset, we discuss the conflicting rights involved. A dispute between a child's parent(s) and grandparent(s) over visitation presents "a conflict between the parent's constitutional right to make decisions about the care and custody of the child and the grandparent's right to visitation under Tennessee Code Annotated section 36-6-306." *Coleman*, 551 S.W.3d at 697; *see Smallwood*, 205 S.W.3d at 362-63. "The right of a parent to raise a child is a fundamental liberty interest protected by the Fourteenth Amendment to the United States Constitution and article I, section 8 of the Tennessee Constitution." *Id.* at 697-98 (citing *Hawk v. Hawk*, 855 S.W.2d 573, 578-79 (Tenn. 1993) (citations omitted)). Parents possess "rights to the care and custody of their children without undue government interference," which "is 'among the oldest of the judicially recognized liberty interests protected by the due process clauses of the federal and state constitutions.'" *Id.* at 698 (quoting *Lovlace*, 418 S.W.3d at 30 (citation omitted)); *see also State ex rel. Bethell v. Kilvington*, 45 S.W. 433, 435 (Tenn. 1898). Parents also have "a privacy interest that protects them from unwarranted state intervention in parental decision-making and prohibits the court from imposing its subjective notion of what is in the 'best interests of the child.'" *Id.* (quoting *Hawk*, 855 S.W.2d at 579-80).

However, "the state may interfere with these rights when there is a compelling state interest." *Id.* (citing *Smallwood*, 205 S.W.3d at 362-63). The Tennessee Supreme Court has explained that "[t]he state has a role of *parens patriae* and a duty to protect minors, and the state may intervene in parental decision-making when necessary to prevent substantial harm to the child." *Id.* (citing *In re Hamilton*, 657 S.W.2d 425, 429 (Tenn. Ct. App. 1983) (citation omitted)); *see also Hawk*, 855 S.W.2d at 581 (holding that "neither the legislature nor a court may properly intervene in parenting decisions absent significant

harm to the child from those decisions"). Parents are protected from unwarranted state interference in the parenting process by this substantial harm requirement. *Id.* (citing *Hawk*, 855 S.W.2d at 579-80).

### i.     *Opposition*

Parents contend that Grandparents did not carry their burden to demonstrate that visitation was opposed or severely reduced.[6] They ask this Court to find that the evidence preponderates against a finding that visitation was opposed, which would render the Grandparent Visitation Statute inapplicable. Again, the Grandparent Visitation Statute provides in pertinent part:

> (a) Any of the following circumstances, when presented in a petition for grandparent visitation to the circuit, chancery, general sessions courts with domestic relations jurisdiction, other courts with domestic relations jurisdiction or juvenile court in matters involving children born out of wedlock of the county in which the petitioned child currently resides, necessitates a hearing *if such grandparent visitation is opposed by the custodial parent or parents . . . or if the grandparent visitation has been severely reduced by the custodial parent or parents . . .* [.]

Tenn. Code Ann. § 36-6-306(a) (emphasis added). "[T]he Grandparent Visitation Statute is not even implicated unless the grandparent can establish that visitation was opposed [or severely reduced] by the custodial parent before the petition was filed." *In re Trinity P.*, No. M2020-01481-COA-R3-JV, 2021 WL 5816456, at *3 (Tenn. Ct. App. Dec. 8, 2021) (quoting *Uselton v. Walton*, No. M2012-02333-COA-R3-CV, 2013 WL 3227608, at *12 (Tenn. Ct. App. June 21, 2013)) (footnote omitted). As such, if the petitioning grandparents are unable to prove either opposition to visitation or severe reduction in visitation, "a trial court has no basis for engaging in substantial harm analysis or awarding the petitioner any relief." *Id.* at *4 (quoting *Morisch v. Maenner*, No. W2020-00362-COA-R3-JV, 2021 WL 1102364, at *3 (Tenn. Ct. App. Mar. 23, 2021) (citing *Manning v. Manning*, 474 S.W.3d 252, 257-58 (Tenn. Ct. App. 2015); Tenn. Code Ann. § 36-6-306(b)-(c))).[7]

---

[6] For this issue, Parents only challenge whether Grandparents carried their burden to demonstrate that visitation was opposed or severely reduced. They do not specifically challenge whether one of the six enumerated statutory circumstances applied. *See* Tenn. Code Ann. § 36-6-306(a)(1)-(6).

[7] In 2016, the Legislature amended the Grandparent Visitation Statute changing "the threshold requirements for application of the . . . Statute insofar as the trial court may now consider ordering visitation upon a showing by the petitioning grandparent that visitation, and as a result the grandparent-grandchild relationship, was severely reduced rather than requiring that visitation must have been opposed or denied by the custodial parent." *In re Trinity P.*, 2021 WL 5816456, at *3 n.6 (quoting *Horton v. Cooley*, No. M2019-00945-COA-R3-CV, 2020 WL 2731235, at *4 n.3 (Tenn. Ct. App. May 26, 2020) (citation omitted)).

The term "opposed," includes "situations both where visitation is denied totally and where visitation is technically not opposed, but the frequency and/or conditions imposed by the parents on visitation are such that it equates to a denial of visitation." *Lovlace*, 418 S.W.3d at 21 (quoting *Huls v. Alford*, No. M2008-00408-COA-R3-CV, 2008 WL 4682219, at *8 (Tenn. Ct. App. Oct. 22, 2008)); *see also Angel v. Nixon*, No. M2010-00554-COA-R3-CV, 2010 WL 4483915, at *3 (Tenn. Ct. App. Nov. 8, 2010); *Wilson v. Gladden*, No. E2008-02283-COA-R3-CV, 2009 WL 2176460, at *2 (Tenn. Ct. App. July 22, 2009). Additionally, "the Legislature's use of the words, 'is opposed by,' means actual existing opposition—not likely future opposition." *Coleman*, 551 S.W.3d at 699. Opposition may be proven "by presenting evidence of actual or constructive denial of visitation." *Id.*

The juvenile court found that Parents opposed Grandparents having any visitation with the child. The court noted that Mother testified she was not opposed to visitation, but she did not want any specific time for visitation in place. The court also noted that Father elected not to testify.

At trial, Grandfather testified that they filed the petition because they had gone "seven months" without seeing the child. He stated that Father did not indicate to him that they were no longer going to be able to see the child. Rather, their requests for time with the child were simply fruitless. He clarified that he asked Father personally for time with the child, but Father would respond, "No, not at this time." Indeed, Parents insinuated in their text messages that Grandparents were no longer allowed to see the child. Parents sent a text message to Grandparents in August 2018 stating that the child would no longer be going to Grandparents' home. Parents sent text messages to Grandparents in December 2018 implying that they would be excluded from the child's life. In response to a texted request for visitation in January 2019, Parents stated "probably not." Despite Parents' sentiments expressed in these text messages, Grandparents were able to see the child in August 2018, December 2018, and January 2019, which was contrary to Grandfather's testimony that they had gone seven months without seeing the child. Before filing their petition in February 2019, the last time Grandparents were able to visit with the child was just a month prior on January 12, 2019. Although he and the child still maintained a close relationship at the time of trial, Grandfather testified that it was not as close as it was two years ago.

Grandmother admitted that they had still been able to see the child some since their visits were stopped in August 2018. However, she described their time with the child during the remainder of 2018 as "sporadic." Similar to Grandfather's testimony, she testified that their relationship still was not as close with the child as it had been in the past. She disagreed that they were still permitted to see the child regularly. They had been permitted two days per week with the child in the past, and now they had approximately 30 minutes per week with the child.

- 13 -

Mother testified that she was not opposed to the child visiting Grandparents and disagreed that Grandparents did not get to see the child for seven months. She explained that she and Father shared the child's school activities and t-ball schedules with them, invited them to the child's birthday parties, and even saw them at family events. During those occasions, she never prevented the child from interacting with Grandparents, or vice-versa. She also testified that the parties agreed to once-a-week visits beginning in September 2019. The parties mutually decided that the once-a-week visit would be the child's karate class on Mondays. From September 2019 until December 2019, Grandparents saw the child at karate and were allowed to spend time with afterward. Beginning in December 2019, however, Parents limited Grandparents time with the child after karate because they were upset that Grandparents were taking them back to court. While Mother admitted that the karate visits were nothing more than allowing Grandparents to lay eyes on the child, she had concerns about the child visiting regularly with Grandparents. She and Father felt that Grandparents' home was a "toxic environment." She explained that this was the very reason the visits on Tuesdays and Fridays with Grandparents had been stopped; she did not want the child to be around the negativity in Grandparents' home. She concluded by stating, "I'm okay with public events and things of that nature, but at this time I don't feel comfortable with him going over there."

Grandparents alleged in their petition that they believed that Parents would refuse or deny visitation unless allowed such visitation at specific times and places. However, "likely future opposition" is not our concern. *See Coleman*, 551 S.W.3d at 699 (explaining that the Grandparent Visitation Statute requires evidence of parental opposition when the petition is filed and requires evidence of existing opposition, not future opposition). Instead, we focus on whether there was opposition prior to the filing of the petition. *In re Trinity P.*, 2021 WL 5816456, at *4; *see Uselton*, 2013 WL 3227608, at *13. Although Grandparents were able to exercise visitation between August 2018 and February 2019, we find that there was sufficient evidence of opposition. After visiting with the child two times every week for approximately four years, Grandparents were only able to visit with the child three times between August 2018 and February 2019. While they did have these few visits, Parents were consistently communicating that they were opposed to visitation. Parents sent a text messages to Grandparents stating that the child would no longer be going to their home, would be fine without them, had enough grownups in his life, would not be coming around at all, and would do just fine without them in his life. Grandparents were denied time with the child at least once in December 2018. A month before the petition was filed, Grandparents were denied time with the child again in January 2019, and Parents indicated that "[t]his is working for us."

We emphasize that Parents desire to not allow the child to have contact with the paternal uncle's friend, who was a stranger to the family, was a reasonable limitation. Further, this restriction, in and of itself, does not constitute opposition to the child visiting with Grandparents. *See Green v. Evans*, No. M2011-00276-COA-R3-CV, 2012 WL

- 14 -

1107887, at *10 (Tenn. Ct. App. Mar. 30, 2012) (holding that a parent's desire to limit the individuals to who her child is exposed when visiting with a grandparent "cannot be considered opposition to visitation."). However, notwithstanding that limitation, the evidence demonstrates Parents opposed grandparent visitation by both "word [and] deed" prior to the petition being filed. *In re Trinity P.*, 2021 WL 5816456, at *4; *see Uselton*, 2013 WL 3227608, at *13.

Accordingly, we conclude that the juvenile court correctly applied the legal standard as required by Tennessee Code Annotated section 36-6-306(a) to find that Parents opposed visitation between Grandparents and the child, or severely reduced visits between Grandparents and the child.

### ii. Substantial Harm

Parents also contend that there was no evidence that the child was suffering substantial harm or severe emotional harm due to Parents' decision to limit his interaction with Grandparents. Here, we begin by addressing the juvenile court's compliance with the mandate in Tennessee Rule of Civil Procedure 52.01. Rule 52.01 provides in part:

> In all actions tried upon the facts without a jury, the court shall find the facts specially and shall state separately its conclusions of law and direct the entry of the appropriate judgment. . . . . If an opinion or memorandum of decision is filed, it will be sufficient if the findings of fact and conclusions of law appear therein.

Tenn. R. Civ. P. 52.01. "The underlying rationale for this mandate is that it facilitates appellate review by 'affording a reviewing court a clear understanding of the basis of a trial court's decision . . . .'" *Gooding v. Gooding*, 477 S.W.3d 774, 782 (Tenn. Ct. App. 2015) (quoting *In re Estate of Oakley*, No. M2014-00341-COA-R3-CV, 2015 WL 572747, at *10 (Tenn. Ct. App. Feb. 10, 2015) (citation omitted)). "[I]n the absence of findings of fact and conclusions of law, 'this court is left to wonder on what basis the court reached its ultimate decision.'" *Id.* (quoting *In re Estate of Oakley*, 2015 WL 572747, at *10 (citation omitted)). Additionally, "findings of fact that are both sufficient and supported by the record 'enhance the authority of the trial court's decision by providing an explanation of the court's reasoning.'" *Id.* (quoting *In re Zaylen R.*, No. M2003-00367-COA-R3-JV, 2005 WL 2384703, at *2 (Tenn. Ct. App. Sept. 27, 2005)).

There is no bright-line test for assessing the sufficiency of the trial court's factual findings. *Id.* Generally, however, "the findings of fact must include as much of the subsidiary facts as is necessary to disclose to the reviewing court the steps by which the trial court reached its ultimate conclusion on each factual issue." *Id.* (quoting *In re Estate of Oakley*, 2015 WL 572747, at *11). Therefore, "[s]imply stating the trial court's decision, without more, does not fulfill [the Rule 52.01] mandate." *Id.* (quoting *Barnes v. Barnes*,

No. M2011-01824-COA-R3-CV, 2012 WL 5266382, at *8 (Tenn. Ct. App. Oct. 24, 2012). Regarding substantial harm, the juvenile court's order only stated, "The Court finds the grandchild had such a significant existing relationship with [Grandparents] that severance or severe reduction of their relationship with [them] is likely to occasion severe emotional harm to the grandchild and poses a danger of substantial harm to the grandchild." This does not fulfill the Rule 52.01 mandate because the juvenile court stated a legal conclusion but failed to explain any factual basis for its decision.

The importance of the trial judge performing his or her duties as a finder of fact cannot be overstated. Likewise, the potential consequences for the parties when a trial judge fails to perform those duties cannot be overstated. As we explained in *Gooding*, "[w]hen the trial court fails to explain the factual basis for its decisions, we may conduct a de novo review of the record to determine where the preponderance of the evidence lies *or* remand the case with instructions to make the requisite findings of fact and conclusions of law and enter judgment accordingly. *Id.* at 783 (emphasis added); *see Lovlace*, 418 S.W.3d at 36; *Ganzevoort v. Russell*, 949 S.W.2d 293, 296 (Tenn. 1997); *Nashville Ford Tractor, Inc. v. Great Am. Ins. Co.*, 194 S.W.3d 415, 424 (Tenn. Ct. App. 2005). Normally, "the appropriate remedy when a trial court fails to make appropriate findings of fact and conclusions of law pursuant to Rule 52.01 is to 'vacate the trial court's judgment and remand the cause to the trial court for written findings of fact and conclusions of law.'" *Manning*, 474 S.W.3d at 260 (quoting *Lake v. Haynes*, No. W2010-00294-COA-R3-CV, 2011 WL 2361563, at *1 (Tenn. Ct. App. June 9, 2011)). Yet, in some cases, "we may 'soldier on' with our review despite the trial court's failure to comply with Rule 52.01." *Id.* (quoting *Pandey v. Shrivastava*, No. W2012-00059-COA-R3-CV, 2013 WL 657799 (Tenn. Ct. App. Feb. 22, 2013)). When faced with this difficult problem in the past, we have made the determination to soldier on "for the sake of judicial economy," *Burse v. Hicks*, No. W2007-02848-COA-R3-CV, 2008 WL 4414718, at *2 (Tenn. Ct. App. Sept. 30, 2008), or in order "to resolve the litigation between the parties," *Hanson v. J.C. Hobbs Co., Inc.*, No. W2011-02523-COA-R3-CV, 2012 WL 5873582, at *10 (Tenn. Ct. App. Nov. 21, 2012). Likewise, we deem it appropriate to conduct a review of this issue in spite of the deficiencies in the juvenile court's order.[8]

In making this decision, we emphasize the important consideration of the stability in the child's life involved in this case. Vacating and remanding for further proceedings would only delay that stability. *See Richardson v. Richardson*, No. M2020-00179-COA-R3-CV, 2021 WL 4240831, at *9 (Tenn. Ct. App. Sept. 17, 2021) (emphasizing that the subject children have been "subjected to fairly continuous upheaval as a result of [the] litigation" and "remanding for further proceedings would only delay the stability that this Court has repeatedly emphasized is an important consideration for the lives of children.").

---

[8] We reiterate that this is generally not the appropriate remedy where a trial court fails to comply with Rule 52.01, and therefore we caution that this Court "may not be so forgiving and accommodating in future appeals." *Ellis v. Duggan*, 644 S.W.3d 85, 96 n.9 (Tenn. Ct. App. 2021).

The child is now eight years old and this litigation has been ongoing since he was four years old.[9]  The child will not benefit from years of further litigation between family members.

By choosing to soldier on, we conduct a de novo review of the record to determine where the preponderance of the evidence lies.  *Gooding*, 477 S.W.3d at 783 (citations omitted).  In section 36-6-306(b), the Grandparent Visitation Statute provides in part:

> (b)(1) In considering a petition for grandparent visitation, the court shall first determine the presence of a danger of substantial harm to the child.  Such finding of substantial harm may be based upon cessation or severe reduction of the relationship between an unmarried minor child and the child's grandparent if the court determines, upon proper proof, that:
>
> > (A) The child had such a significant existing relationship with the grandparent that loss or severe reduction of the relationship is likely to occasion severe emotional harm to the child;
> > (B) The grandparent functioned as a primary caregiver such that cessation or severe reduction of the relationship could interrupt provision of the daily needs of the child and thus occasion physical or emotional harm; or
> > (C) The child had a significant existing relationship with the grandparent and loss or severe reduction of the relationship presents the danger of other direct and substantial harm to the child.
>
> (2) For purposes of this section, a grandparent shall be deemed to have a significant existing relationship with a grandchild if:
>
> > (A) The child resided with the grandparent for at least six (6) consecutive months;
> > (B) The grandparent was a full-time caretaker of the child for a period of not less than six (6) consecutive months; or
> > (C) The grandparent had frequent visitation with the child who is the subject of the suit for a period of not less than one (1) year.
>
> (3) A grandparent is not required to present the testimony or affidavit of an expert witness in order to establish a significant existing relationship with a grandchild or that the loss or severe reduction of the relationship is likely to occasion severe emotional harm to the child.  Instead, the court shall consider

---

[9] The juvenile court held trial on Grandparents' petition occurred in September 2020, but the order from the hearing was not entered until July 2021.  The record does not reveal the reason for the delay in the entry of the order.

whether the facts of the particular case would lead a reasonable person to believe that there is a significant existing relationship between the grandparent and grandchild or that the loss or severe reduction of the relationship is likely to occasion severe emotional harm to the child.

Tenn. Code Ann. § 36-6-306(b)(1)-(3).[10]  The juvenile court found that Grandparents maintained a significant existing relationship with the child and had assisted as caretakers of the child.  Parents do not dispute that the child and Grandparents had a significant existing relationship within the meaning of the law.  Regardless, we have held that "[t]he mere fact that a significant existing relationship exists will not suffice for a showing of substantial harm." *In re Gracelyn H.*, No. W2021-00141-COA-R3-JV, 2022 WL 1008312, at *4 (Tenn. Ct. App. Apr. 4, 2022) (quoting *Huffman v. Huffman*, No. E2012-02164-COA-R3-CV, 2013 WL 4715042, at *7 (Tenn. Ct. App. Aug. 30, 2013)).  We also note that we must avoid the assumption that a grandparent-grandchild relationship always benefits the grandchild.  *McGarity v. Jerrolds*, 429 S.W.3d 562, 570 (Tenn. Ct. App. 2013) (quoting *Green*, 2012 WL 1107887, at *8).

As stated before, the juvenile court found that severance or severe reduction of the relationship between Grandparents and the child was likely to occasion severe emotional harm to the child and posed a danger of substantial harm to the child.  However, our review of the record reveals that the evidence was insufficient to support this conclusion.  There was very little testimony on whether the child was actually suffering harm or was likely to suffer harm in the future.  Grandmother testified that the child was still happy and healthy and did not show anger or aggression when she did get to see him.  She stated that he would cry sometimes when they dropped him off after visits because he felt that he did not have enough time with them.  She also stated that he would ask questions and express emotions regarding his limited interaction with them.[11]  Yet, she admitted that the child was doing great, and she testified that there was no specific evidence that he was suffering severe harm.  Mother also testified that she had not noticed any anger or aggression and had no concerns with the child's behavior.  Contrary to Grandmother's testimony, she stated that she never saw the child cry, become upset, or have a hard time leaving Grandparents when they dropped him off after visits.  Both Grandfather and Grandmother testified that their relationship with the child was not as close as it had been in the past, but they did not testify as to any harm that had come to the child as a result.

We reiterate that Parents are protected from unwarranted state interference in the

_____

[10] Grandparents did not present any testimony or affidavit of an expert witness, but we emphasize that this is not required and "[t]he court need only 'consider whether the facts of the particular case would lead a reasonable person to believe that there is a significant existing relationship between the grandparent and grandchild or that the loss or severe reduction of the relationship is likely to occasion severe emotional harm to the child.'" *Angel*, 2010 WL 4483915, at *4 (quoting Tenn. Code Ann. § 36-6-306(b)(3)).

[11] Grandmother did not elaborate on what emotions the child expressed due to an objection by opposing counsel.

parenting process by the substantial harm requirement. *Coleman*, 551 S.W.3d at 698 (citing *Hawk*, 855 S.W.2d at 579-80). Grandparents bear the burden of proving substantial harm or severe emotional harm. *See McGarity*, 429 S.W.3d at 579 ("Without a showing of either 'substantial harm' or 'severe emotional harm,' Grandparents have not met their burden to justify intrusion into [Parents'] decision to terminate visitation . . . ."). "Proving a likelihood of 'severe emotional harm' requires 'evidence to support a finding that the child is likely to suffer . . . harm that could reasonably be categorized as severe, grave, distressing, or extreme." *In re Gracelyn H.*, 2022 WL 1008312, at *4 (quoting *McGarity*, 429 S.W.3d at 579 (citing *Severe*, Black's Law Dictionary (5th ed. 1979))). Substantial harm "connotes a real hazard or danger that is not minor, trivial, or insignificant." *Id.* (quoting *Ray v. Ray*, 83 S.W.3d 726, 732 (Tenn. Ct. App. 2001)).

Grandparents argue that the evidence of harm in this case is "virtually identical" to the evidence of harm in *Cupples v. Holmes*, No. W2021-00523-COA-R3-CV, 2022 WL 970731, at *7-12 (Tenn. Ct. App. Mar. 31, 2022). Yet, unlike the *Cupples* case, there was no evidence here that the child's personality or disposition had changed. Grandmother's own testimony revealed that the child was still happy and healthy and that there was no specific evidence of harm due to the limited interaction he was having with Grandparents. Mother concluded the same in her testimony. Other than the child's teary episodes when he was dropped off by Grandparents after visits, which was disputed by Mother, there was no evidence that the he "suffered any ill effects" due to his limited interaction with Grandparents. *McGarity*, 429 S.W.3d at 580. Grandmother testified that the child asked questions and expressed emotions about his time with Grandparents, but there was no evidence of harm that could be categorized as "severe, grave, distressing, or extreme" or "a real hazard or danger." *In re Gracelyn H.*, 2022 WL 1008312, at *4 (citations omitted). The evidence in the record before us was insufficient to support a showing of substantial harm or severe emotional harm.

Proving harm was Grandparents' burden to bear, and the record demonstrates that they failed to carry that burden. Based on the lack of evidence regarding harm, we find that the evidence preponderates against the juvenile court's finding that the child was likely to suffer substantial harm or severe emotional harm. Consequently, we reverse the decision of the juvenile court awarding grandparent visitation and dismiss the case.

## V.    CONCLUSION

For the aforementioned reasons, we reverse the decision of the juvenile court and dismiss the case. Costs of this appeal are taxed to the appellees, Randall D. and Holly D., for which execution may issue if necessary.

_____
CARMA DENNIS MCGEE, JUDGE

- 19 -