IN THE SUPREME COURT OF TENNESSEE
AT NASHVILLE
May 3, 2022 Session

## CITY OF KNOXVILLE, TENNESSEE v. NETFLIX, INC. ET AL.

**Certified Question of Law
from the United States District Court
for the Eastern District of Tennessee
No. 3-20-CV-00544-DCLC-DCP   Clifton L. Corker, Judge**

———————————————————

### No. M2021-01107-SC-R23-CV

———————————————————

This is a case about fitting new technology into a not-so-new statutory scheme. Exercising our power to answer questions certified to us by federal courts, we consider whether two video streaming services—Netflix, Inc. and Hulu, LLC—provide "video service" within the meaning of a Tennessee law that requires such providers to obtain a franchise and pay franchise fees to localities. Netflix and Hulu say they do not provide "video service" and therefore do not owe franchise fees; the City of Knoxville says they do. We agree with Netflix and Hulu.

### Tenn. Sup. Ct. R. 23 Certified Question of Law

SARAH K. CAMPBELL, J., delivered the opinion of the court, in which ROGER A. PAGE, C.J., and SHARON G. LEE, JEFFREY S. BIVINS, and HOLLY KIRBY, JJ., joined.

Victor Jih, Los Angeles, California, and John L. Farringer and Hunter Branstetter, Nashville, Tennessee, for the petitioner, Hulu, LLC.

Mary Rose Alexander and Robert C. Collins III, Chicago, Illinois, Jean A. Pawlow and Gregory G. Garre, Washington, D.C., and W. Tyler Chastain, Knoxville, Tennessee, for the petitioner, Netflix, Inc.

James Gerard Stranch, IV and Benjamin A. Gastel, Nashville, Tennessee, Austin Tighe, Michael Angelovich, and Chad E. Ihrig, Austin, Texas, and Justin J. Hawal, Mentor, Ohio, for the respondent, City of Knoxville, Tennessee.

John Bergmayer, Washington, D.C., and Buck Lewis and Charles C. McLaurin, Nashville, Tennessee, for the amicus curiae, Public Knowledge.

Buck Lewis and Charles C. McLaurin, Nashville, Tennessee, and Pantelis Michalopoulos, Matthew R. Friedman, and Jared R. Butcher, Washington, D.C., for the amici curiae, DISH Network Corp. and DISH Network L.L.C.

Mandy Strickland Floyd, Nashville, Tennessee, and Adam H. Charnes, Dallas, Texas, for the amicus curiae, DIRECTV, LLC.

## OPINION

### I.

In the cable industry, a "franchise" is authorization from a government entity to construct or operate a cable system in the public rights-of-way. *See* 47 U.S.C. § 522(9)–(10). Federal law allows state and local governments to issue franchises within their jurisdictions. *See id.* § 541(a); *see also id.* § 521(3). This allocation of authority reflects the principal justification for cable franchising—localities' "need to regulate and receive compensation for the use of public rights-of-way." *In re Implementation of Section 621(a)(1) of the Cable Communications Policy Act of 1984 as amended by the Cable Television Consumer Protection and Competition Act of 1992*, 22 FCC Rcd. 5101, 5135 (Mar. 5, 2007) (hereinafter *FCC Order*). Before reforming its franchise system in 2008, Tennessee, like many States, allowed counties and municipalities to exercise this authority by granting franchises at the local level. Tenn. Code Ann. § 7-59-102 (2005) (amended 2008). And traditional cable companies, which provide cable television through cable facilities—e.g., equipment such as transmission lines—located in the public rights-of-way, were the primary franchise recipients. *FCC Order*, 22 FCC Rcd. at 5103, 5135; *see also* U.S. Dep't of Justice, *Voice, Video and Broadband: The Changing Competitive Landscape and Its Impact on Consumers* 5, 9, A-2 (Nov. 2008), https://perma.cc/4JWA-65NF (hereinafter *DOJ Report*).

The entry of new competitors into the cable market led to changes in the local character of franchising, but not its facilities-based nature. In the mid-2000s, telephone companies like AT&T and Verizon began upgrading their existing networks to allow bundling of video, internet, and telephone services. *FCC Order*, 22 FCC Rcd. at 5103; *DOJ Report*, *supra*, at 6–9; *see also* Robert W. Crandall et al., *Does Video Delivered over a Telephone Network Require a Cable Franchise?*, 59 Fed. Comm. L.J. 251, 253 (2007). Many of these new entrants already had access to public rights-of-way but sought cable franchises to upgrade old facilities and build new ones. *FCC Order*, 22 FCC Rcd. at 5103, 5108, 5112. That process was cumbersome, because they often needed to obtain franchises from as many as thousands of localities. *Id.* at 5108–09, 5112 & n.72, 5120; *see also* Crandall et al., *supra*, at 253–54.

In response, several States passed legislation to streamline the franchising process. *FCC Order*, 22 FCC Rcd. at 5109. Tennessee was among them. In 2008, the Tennessee

General Assembly enacted the Competitive Cable and Video Services Act (the "Act"). Act of May 15, 2008, ch. 932, 2008 Tenn. Pub. Acts 479, 480–525 (codified at Tenn. Code Ann. §§ 7-59-301 to -318 (2015 & Supp. 2022)). While the Act preserved the option of negotiating franchise agreements with individual localities, it offered cable and video service providers the alternative of obtaining a state-issued certificate of franchise authority that would apply in multiple jurisdictions across the State. Tenn. Code Ann. § 7-59-304(a)(2).

The Act has two essential features that are relevant here. First, the Act requires "[a]ny entity . . . seeking to provide cable or video service over a cable system or video service network facility" to obtain a franchise. *Id.* § 7-59-304(a)(1); *see also id.* § 7-59-305(a) (requiring "a cable or video service provider [to] file an application [for a state-issued franchise] with the [Tennessee Public Utility Commission]"). A "franchise" "authoriz[es]" a cable or video service provider "to construct and operate a cable or video service provider's facility within the public rights-of-way used to provide cable or video service." *Id.* § 7-59-303(8) (incorporating definition from 47 U.S.C. § 522(9)); *see also id.* § 7-59-305(e). The Act defines the term "video service" to mean "the provision of video programming through wireline facilities located, at least in part, in the public rights-of-way without regard to delivery technology, including Internet protocol technology or any other technology." *Id.* § 7-59-303(19); *see also id.* § 7-59-303(20) (defining a "video service provider" as "a provider of video service"). The Act, however, excludes from the definition of "video service" "any video programming . . . provided as part of, and via, a service that enables end users to access content, information, electronic mail or other services offered over the public Internet." *Id.* § 7-59-303(19).

Second, the Act provides that—in exchange for receiving authorization to use a locality's public rights-of-way—the holder of a state-issued franchise must pay a franchise fee. *Id.* § 7-59-306(a). The fee is based primarily on the holder's gross revenues from providing cable or video service within a specific city or county, *id.*, and the holder pays this fee to the relevant locality, *id.* § 7-59-306(c)(1). The fee is "intended as a form of compensation for the provider's occupancy of the public rights-of-way" in the city or county, and a locality may not impose any other taxes or fees on providers for that purpose. *Id.* § 7-59-306(i). The Act thus ties the franchise-fee obligation to physical occupation of public rights-of-way in specific localities—consistent with the principal justification for cable franchising.

Since the Act's passage, facilities-based providers have obtained franchises to build and operate networks in Tennessee's public rights-of-way. *See* Tennessee Advisory Commission on Intergovernmental Relations, *Local Government Revenue in Tennessee and the Evolving Market for Cable Television, Satellite Television, and Streaming Video Services* 5–7 (Sept. 2019), https://perma.cc/9AUQ-J3GK (hereinafter *TACIR Report*). Such providers use these networks to carry television service to their subscribers. *Id.* at 14. And they remit franchise fees to the localities where they provide service. *Id.* at 7.

In the last decade or so, video streaming services, like Petitioners Netflix and Hulu, have surged into competition with these facilities-based providers, attracting increasingly large numbers of subscribers, many of whom have "cut the cable cord." *See id.* at 1–2, 13. But unlike cable or telephone companies, Netflix and Hulu have not obtained franchises and instead have relied on third-party internet service providers ("ISPs")—including those same cable or phone companies—to transmit their video content to the end-user. *See id.* In layman's terms, Netflix and Hulu subscribers use an internet-connected device to send a request to view particular content to a Netflix or Hulu server, which then returns a response—the requested content. Both signals typically travel over broadband internet connections via wireline facilities that are located in public rights-of-way and operated by ISPs. Netflix and Hulu do not own or operate those wireline facilities; in Knoxville, as elsewhere, they depend on the facilities of third-party ISPs to connect subscribers to their content. Nor do Netflix and Hulu pay franchise fees to the localities where subscribers stream their content.

The City of Knoxville asserts that Netflix and Hulu ought to pay franchise fees because they use the public rights-of-way to provide video service. Knoxville sued Netflix and Hulu in the United States District Court for the Eastern District of Tennessee, seeking a declaratory judgment to that effect on behalf of a putative class of all Tennessee municipalities and counties in which Netflix or Hulu has subscribers. Knoxville contends that Netflix and Hulu are "video service providers" as defined in the Act. According to Knoxville, Netflix and Hulu were thus required to apply for a franchise and pay franchise fees to Knoxville and violated the Act by failing to do so.

Netflix and Hulu both filed motions to dismiss, arguing among other things that they do not provide "video service" under the Act. After the completion of briefing, the district court entered an order staying the case and certifying the following question of law to this Court: "Whether Netflix and Hulu are video service providers, as that term is defined in the relevant provision of [the Act], Tenn. Code Ann. § 7-59-303(19)." We accepted the certified question.[1]

II.

As head of the Tennessee judiciary, this Court has inherent power to answer questions certified to us by the federal courts. *Haley v. Univ. of Tenn.-Knoxville*, 188 S.W.3d 518, 523 (Tenn. 2006); *see also* Tenn. Sup. Ct. R. 23. Here, the certified question is one of statutory interpretation. In interpreting statutes, our job is to give effect to the text the legislature enacted. *State v. Hawk*, 170 S.W.3d 547, 551 (Tenn. 2005); *see also* *BellSouth Telecomms., Inc. v. Greer*, 972 S.W.2d 663, 672–73 (Tenn. Ct. App. 1997). In

---

[1] In their briefs, Netflix and Hulu ask this Court to answer an additional question that was not certified: whether Knoxville has a private right of action under the Act. We decline to reach that question.

the absence of statutory definitions, we give the words of the statute their "natural and ordinary meaning." *Ellithorpe v. Weismark*, 479 S.W.3d 818, 827 (Tenn. 2015) (quoting *Johnson v. Hopkins*, 432 S.W.3d 840, 848 (Tenn. 2013)). To determine that meaning, we read statutory language in its context and "in the context of the entire statutory scheme." *Hathaway v. First Fam. Fin. Servs., Inc.*, 1 S.W.3d 634, 640 (Tenn. 1999) (quoting *Storey v. Bradford Furniture Co.*, 910 S.W.2d 857, 859 (Tenn. 1995)); *see also West Virginia v. EPA*, 142 S. Ct. 2587, 2607 (2022); Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 167 (2012) ("Context is a primary determinant of meaning.").

## III.

Netflix and Hulu are "video service providers" if they provide "video service" as defined by section -303(19) of the Act. *See* Tenn. Code Ann. § 7-59-303(20). Knoxville argues that Netflix and Hulu are "video service providers" because they (a) provide "video programming" and (b) do so "through wireline facilities located, at least in part, in the public rights-of-way." Netflix and Hulu counter that they do not provide "video service" because, among other things, they do not own, construct, or operate the wireline facilities that third-party ISPs use to deliver Netflix and Hulu content to end-users. We agree with Netflix and Hulu and conclude that they are not video service providers within the meaning of the Act.[2]

## A.

Under the Act, an entity provides "video service" if it engages in the "provision of video programming through wireline facilities located, at least in part, in the public rights-of-way." *Id.* § 7-59-303(19). No one disputes that the streaming content that Netflix and Hulu sell travels over wireline facilities located in the public rights-of-way to reach their subscribers. But the parties disagree about whether Netflix and Hulu's use of wireline facilities owned and operated by third-party ISPs counts as the "provision of video programming through wireline facilities" within the meaning of the Act.

Knoxville argues that the referenced "wireline facilities" may include facilities owned, constructed, and operated by another entity. Knoxville points out that section -303(19) refers to "wireline facilities" without limitation to those that are owned, constructed, or operated by the provider, and it accuses Netflix and Hulu of improperly reading words into the statute. Netflix and Hulu, on the other hand, argue that reading

---

[2] Netflix and Hulu press other arguments as to why they are not required to obtain a franchise or pay franchise fees. Both entities argue that their programming falls within the exception in section -303(19) for programming "provided as part of, and via, a service that enables end users to access content, information, electronic mail or other services offered over the public Internet." Tenn. Code Ann. § 7-59-303(19). Netflix further contends that its content does not constitute "video programming" within the meaning of section -303(18). Because we agree with Netflix and Hulu's argument regarding wireline facilities, we do not reach those additional arguments.

section -303(19) to encompass entities that do not own, construct, or operate any wireline facilities would make a mess of the overall statutory scheme, which is focused on physical occupation of the public rights-of-way.

The text of section -303(19), in isolation, does not resolve this dispute. Knoxville is right that the term "wireline facilities" is not textually limited to those owned, constructed, or operated by the provider. But the text of section -303(19) does not preclude Netflix and Hulu's narrower interpretation either.

Fortunately, we need not and "should not" confine our analysis to "interpret[ing] [section -303(19)] in isolation." *Coffee Cnty. Bd. of Educ. v. City of Tullahoma*, 574 S.W.3d 832, 846 (Tenn. 2019). Because "[t]he meaning . . . of certain words may only become evident when placed in context," we must read statutory terms "in their context and with a view to their place in the overall statutory scheme." *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 132–33 (2000) (quoting *Davis v. Mich. Dep't of Treasury*, 489 U.S. 803, 809 (1989)); *see also Coffee Cnty.*, 574 S.W.3d at 846 (explaining that "statutes should not be interpreted in isolation" but in view of "[t]he overall statutory framework"). We thus consider the Act as a whole and seek to interpret section -303(19) as part of "a symmetrical and coherent regulatory scheme." *Brown & Williamson*, 529 U.S. at 133 (quoting *Gustafson v. Alloyd Co.*, 513 U.S. 561, 569 (1995)).

i.

Consideration of the Act as a whole makes the meaning of section -303(19) clear. At least two features of the Act clarify that the "wireline facilities" referenced in section -303(19) must be operated by the video service provider.

*First*, the Act expressly contemplates that the entities required to obtain a franchise will be those that actually construct and operate the facilities in the public rights-of-way that are used to provide video service. The Act forbids a "video service provider" from providing video service without a franchise, Tenn. Code Ann. § 7-59-304(a)(1), and it defines a "franchise" to mean "authorization to construct and operate a cable or video service provider's facility within the public rights-of-way used to provide cable or video service," *id.* § 7-59-303(8).[3] And the Act likewise prescribes that a franchise-authority certificate must contain two authorizations—one to "provide cable or video service" and another "to construct, maintain and operate facilities through . . . any public rights-of-way." *Id.* § 7-59-305(e)(1)–(2).

---

[3] The Act also incorporates by reference the federal definition of "franchise," *see* Tenn. Code Ann. § 7-59-303(8), which similarly defines the term to mean "initial authorization, or renewal thereof . . . which authorizes the construction or operation of a cable system," 47 U.S.C. § 522(9).

Other provisions of the Act similarly link franchise holding with construction or operation of facilities in the public rights-of-way. For example, section -305(c)(8) provides that an application for a franchise "shall . . . affirm" that "[n]otice will be provided to other entities with facilities in the rights-of-way . . . prior to performing any installation in the right-of-way." *Id.* § 7-59-305(c)(8). Section -310(a)(3) assumes a franchise holder's use of the public rights-of-way, requiring video service providers to "abide by the rights-of-way ordinances and resolutions of the municipality or county . . . in which the service is provided." *Id.* § 7-59-310(a)(3); *see also id.* § 7-59-318(a) (requiring a franchise holder to indemnify state and local governmental authorities for claims "for injury or death to persons or damage to property . . . arising out of, caused by, or as a result of the holder's exercising its [franchise] authority"). And section -305(h) specifies that even if a franchise holder "terminate[s] its state-issued certificate of franchise authority," it remains obligated to "remov[e] . . . its facilities within the public right-of-way." *Id.* § 7-59-305(h).

Still other provisions impose obligations on video service providers that only a facilities-based operator could perform. The Act, for example, provides that, under certain circumstances, "the cable or video service provider shall designate . . . a sufficient amount of capacity on its cable system or video service network" for public, educational, and governmental access channels. *Id.* § 7-59-309(e). Similarly, the Act mandates that the holder of an unexpired local franchise "shall" grant local governments the ability to "override the cable or video system" in case of emergency, even after "a cable provider or video service provider" has elected to terminate the local franchise. *Id.* § 7-59-305(l); *see also id.* § 7-59-303(11)(A)(v) (defining "gross revenues" to exclude "[r]evenue from services provided *over the cable system or video service system* that are associated with or classified as non-cable or non-video services under federal law" (emphasis added)).

*Second*, the Act expressly connects payment of the franchise fee with physical occupation of the public rights-of-way. Under the Act, only a franchise holder must pay a franchise fee. *Id.* § 7-59-306(a)(1). This fee is principally "derived from . . . [t]he provision of cable or video service to subscribers located within the municipality or . . . county." *Id.* § 7-59-306(a)(1)(A). Yet the fee is not a tax on revenues derived from the locality. Rather, it is "intended" to "compensat[e]" the locality "for the [cable or video service] provider's occupancy of the public rights-of-way" within its territory. *Id.* § 7-59-306(i). In other words, a video service provider must acquire a franchise and pay a franchise fee as compensation for its facilities' presence in a particular locality's public rights-of-way. It follows that an entity that does not occupy the rights-of-way in a locality does not owe that locality compensation and thus does not need a franchise or owe a franchise fee.

The Act as a whole, then, is focused on granting video service providers permission to physically occupy the public rights-of-way and ensuring that those providers adequately compensate localities for that privilege. Given the Act's focus, it would make little sense to interpret it to apply to entities like Netflix and Hulu that do not construct or operate the wireline facilities that are used to transmit their content. And we must interpret

section -303(19) as part of "a symmetrical and coherent regulatory scheme." *Brown & Williamson*, 529 U.S. at 133 (quoting *Gustafson*, 513 U.S. at 569). We thus conclude that an entity does not engage in the "provision of video programming through wireline facilities," Tenn. Code Ann. § 7-59-303(19), when it provides video programming through wireline facilities operated by a third party.

This conclusion comports with a 2019 report by the Tennessee Advisory Commission on Intergovernmental Relations concerning the "effects of cord cutting . . . on local government revenue in Tennessee." *TACIR Report*, *supra*, at 2. The Commission—whose membership consists primarily of state and local officials, including nearly a dozen state legislators—predicted that local revenue would decrease if cord cutting continued. *Id.* at 1. This prediction was based on the Commission's understanding that video streaming services are "[n]ot required to enter franchise agreements with state or local governments" because they do not "deploy any of their own infrastructure in public rights-of-way." *Id.* at 32, 59.

ii.

Other States have statutes similar to Tennessee's. And while we are the first appellate court to consider whether Netflix or Hulu provide "video service" within the meaning of those statutes, trial courts to consider the question have almost uniformly agreed that the provision of "video service" does not include transmission of programming via third-party-operated facilities.[4] *See, e.g.*, *Gwinnett Cnty. v. Netflix, Inc.*, No. 20-A-07909-10, 2022 WL 678784, at *6–7 (Ga. Super. Ct. Feb. 18, 2022) (holding, based largely on the definition of "franchise," that Georgia's law did not apply to entities that did not own networks in the public rights-of-way, did not need to construct or operate such networks, and thus did not need authorization to do so); *City of Lancaster v. Netflix, Inc.*, No. 21STCV01881, 2022 WL 1744233, at *8–9 (Cal. Super. Ct. Apr. 13, 2022) (rejecting interpretation of "provided through facilities" that would have "required [Defendant streaming services] to obtain a 'construction and operation' franchise even though Defendants did not construct and do not operate facilities in the rights-of-way"); *City of Kenner v. Netflix, Inc.*, No. 814-168, 2022 WL 4101746, at *1 (La. Dist. Ct. Aug. 25, 2022) (concluding, based on Louisiana's definition of "franchise," that because neither Netflix nor Hulu "construct, operate, install, or otherwise maintain any cable system, wireline facilities, or other infrastructure in the public rights of way," they need not "obtain a

---

[4] Other courts have concluded that Netflix's and Hulu's streaming services fall within the exception to the definition of "video service" for "video programming 'provided . . . via a service that enables end users to access content . . . offered over the public Internet.'" *City of Ashdown v. Netflix, Inc.*, 565 F. Supp. 3d 1111, 1115–16 (W.D. Ark. 2021) (quoting Ark. Code Ann. § 23-19-202(15)(B)(ii)) (holding that Netflix fell within the public-internet exception and declining to consider whether it was a "video service provider"), *aff'd on other grounds*, ___ F.4th ___, 2022 WL 16754392 (8th Cir. Nov. 8, 2022); *see also City of Reno v. Netflix, Inc.*, 558 F. Supp. 3d 991, 996–97 (D. Nev. 2021) (same), *aff'd on other grounds*, ___ F.4th ___, 2022 WL 15579803 (9th Cir. Oct. 28, 2022).

franchise before they make their content available to their customers"); *City of Fort Scott v. Netflix, Inc.*, No. BB-2021-CV-000166, at 3 (Kan. Dist. Ct. Oct. 10, 2022) (reasoning that neither Netflix nor Hulu "provide 'video service'" under Kansas's Video Competition Act because they "do not use the public rights-of-way" and instead transmit their content to "subscribers over the wirelines of third-party ISPs").

Our interpretation of "video service provider" under the Act also accords with administrative and judicial interpretations of related statutory schemes. *See City of Chicago v. FCC*, 199 F.3d 424, 429–33 (7th Cir. 1999) (agreeing with the Federal Communications Commission that a cable programming provider did not provide service through "a cable system" because the provider fell within an exclusion for "a facility that serves subscribers without using any public right-of-way" where the provider transmitted its signal over a third-party's cable lines); *AT&T Commc'ns of the Sw., Inc. v. City of Austin*, 40 F. Supp. 2d 852, 855–56 (W.D. Tex. 1998) (rejecting argument that a telephone provider "use[d] and . . . occup[ied]" the public rights-of-way and was therefore required to obtain a franchise where the provider had "no ownership or operational rights" over the third-party-owned facilities it used to transmit signals to its customers), *judgment vacated for mootness*, 235 F.3d 241, 243 (5th Cir. 2000). To be sure, as Knoxville points out, those cases involved different technologies and statutes. But their reasoning is instructive, and it supports our conclusion that entities providing video programming via a third-party's facilities located in the public rights-of-way are not required to obtain a franchise.

Knoxville relies heavily on a Missouri trial court's ruling that use of another entity's wireline facilities to deliver video programming to the end-user may qualify as provision of video service under a similar statute. *See City of Creve Coeur v. Netflix, Inc.*, No. 18SL-CC02819, ¶ 15 (Mo. Cir. Ct. Dec. 30, 2020). But that opinion considered only whether the municipal plaintiff had pleaded sufficient facts to survive a motion to dismiss. More importantly, it engaged in no serious analysis of the phrase "provision . . . through wireline facilities" in the statutory definition of "video service" and focused instead on whether allegations about the defendants' streaming content satisfied the meaning of "video programming." *Id.* ¶¶ 15–21. We thus do not find its analysis helpful.

iii.

Knoxville raises three additional arguments in favor of interpreting "provision . . . through wireline facilities" to include provision through a third-party's wireline facilities. None is persuasive.

First, Knoxville points out that section -303(19) includes the phrase "without regard to delivery technology, including Internet protocol technology or any other technology," Tenn. Code Ann. § 7-59-303(19), and argues that this language "reflects the legislature's intent to encompass future emerging technology, such as over-the-top video programming." But that language, too, must be read in context. Given the Act's focus

elsewhere on physical occupation of the public rights-of-way, we think that phrase is better understood to encompass entities like AT&T and Verizon that provide video programming through wireline facilities they operate but do so using internet technology.

Second, Knoxville contends that the Act allows, but does not require, a franchise holder to construct facilities, so section -303(19) may cover an entity that does not plan to build facilities in the public rights-of-way. In support, Knoxville cites the definition of "franchise area," which means "the geographical area . . . within which a [franchise] holder . . . is seeking authority to deliver cable or video services." *Id.* § 7-59-303(9). This definition, Knoxville argues, envisions that a franchise holder might merely "deliver cable or video services," rather than construct facilities. But Knoxville fails to reconcile its "permissive" interpretation with any of the other provisions explicitly linking the franchise requirement to construction or operation of facilities in the public rights-of-way. *See supra* section III(A)(i). For example, it fails to explain why, assuming its interpretation is correct, a franchise only provides "authorization to construct and operate a cable or video service provider's facility"—not to *use another entity's* facility. *See* Tenn. Code Ann. § 7-59-303(8). Nor does it reconcile its interpretation with provisions, such as sections -305(l) and -309(e), mandating that a "video service provider" take certain actions with respect to "its . . . video service network" or "video system." *Id.* §§ 7-59-305(l), 7-59-309(e).

Third, Knoxville argues that Netflix and Hulu's popularity has caused ISPs to build additional capacity in public rights-of-way and that Netflix and Hulu therefore ought to compensate municipalities for benefitting from these improvements. This is a policy argument that "must be made to the General Assembly," not to this Court. *Mooney v. Sneed*, 30 S.W.3d 304, 308 (Tenn. 2000); *see also New York v. FERC*, 535 U.S. 1, 24 (2002). Unlike the legislature, we are not well situated to weigh competing policy arguments involving rapidly changing technologies in a complex economic sector subject to substantial federal and state regulation.

We conclude that entities that do not operate facilities in the public rights-of-way do not fall within the Act's definition of a "video service provider."

B.

That brings us to the definition's application here. Under our interpretation of section -303(19), Netflix and Hulu do not qualify as "video service" providers.

As alleged in Knoxville's complaint, Netflix and Hulu do not carry video content over their own wireline facilities. Instead, Netflix and Hulu subscribers "send a request to the Internet-service provider," which "forwards that request to Netflix's and Hulu's dedicated Internet servers" and "relay[s Netflix's or Hulu's response] back to the subscriber's device." As Knoxville puts it, the "ISP acts in the role of a common carrier for [Netflix's and Hulu's] content." And these ISPs, not Netflix and Hulu, "own and operate

wireline facilities in public rights-of-way." Netflix and Hulu, for their part, "arrange to deliver [their content] to [their] customer[s] via the ISP's wireline facilities."

So assuming the content offered by Netflix and Hulu qualifies as "video programming," they do not "provid[e]" it "through wireline facilities" within the meaning of section -303(19). They do not construct or operate the facilities through which their content passes and rely instead on third-party ISPs to transmit it to the end-user. Thus, they do not provide "video service" under the Act.

\* \* \*

In sum, we answer the district court's certified question "no": Netflix and Hulu do not provide "video service" within the meaning of section -303(19) and thus do not qualify as "video service providers" under section -303(20).

Pursuant to Tennessee Supreme Court Rule 23, section 8, we direct the Appellate Court Clerk to send a copy of this opinion to the United States District Court for the Eastern District of Tennessee. Costs are taxed against the City of Knoxville, for which execution may issue if necessary.

_____
SARAH K. CAMPBELL, JUSTICE